888 F.2d 891
 281 U.S.App.D.C. 194
 UNITED STATES of America
v.
Jerome S. EVANS, Appellant.
UNITED STATES of America
v.
Tyrone CURREN, a/k/a Edward Tyson, Appellant.
UNITED STATES of America
v.
Kerry WEBBER, a/k/a David Richardson, Appellant.
 Nos. 88-3126, 88-3127 and 88-3157.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 28, 1989.
Decided Nov. 3, 1989.
 
 G. Godwin Oyewole, Alexandria, Va. (appointed by this Court) for appellant, Jerome S. Evans in No. 88-3126.
 Mona Asiner, Alexandria, Va. (appointed by this Court) for appellant, Tyrone Curren in No. 88-3127.
 Anthony C. Vance, Washington, D.C. (appointed by this Court) for appellant, Kerry Webber in No. 88-3157.
 Rachel Adelman-Pierson, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Helen M. Bollwerk, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.
 Before WALD, Chief Judge; BUCKLEY and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 These appeals arise from judgments of conviction of Jerome Evans, Tyrone Curren, and Kerry Webber (collectively "appellants") of possession with intent to distribute more than 50 grams of a cocaine mixture, 21 U.S.C. Secs. 841(a) and 841(b)(1)(A)(iii); using or carrying a firearm in connection with a drug-trafficking offense, 18 U.S.C. Sec. 924(c)(1); and three counts of possessing an unregistered firearm, D.C.Code Sec. 6-2311(a).
 
 
 2
 Evans challenges the sufficiency of the evidence against him on all counts and contends that the District Court improperly admitted the testimony of a threatened witness without holding a hearing to determine whether the threat affected her mental attitude and influenced her testimony. Curren argues that the trial court erroneously instructed the jury on the elements of using or carrying a firearm in relation to a drug-trafficking offense, 18 U.S.C. Sec. 924(c)(1), and challenges the sufficiency of the evidence against him on all counts. Webber challenges the sufficiency of the evidence to support his convictions for possession with intent to distribute drugs and for possession of unregistered firearms. With respect to the possession of unregistered firearms counts, Webber contends that his real name is David Richardson, so that the government's evidence that the firearms were not registered to Kerry Webber is insufficient to show that the guns were not, in fact, registered. Webber also contends that a mistrial or dismissal is warranted because of the prosecution's failure to produce relevant evidence in a timely manner.
 
 
 3
 We affirm the convictions of all defendants on all counts.
 
 I. BACKGROUND
 
 4
 The government's principal witness was Raoul Civil. Civil testified that on March 5, 1988, Evans, Curren, and Webber picked up Civil at his New York apartment and took him to a Bronx apartment where Evans produced a paper bag filled with cocaine. After Civil was inept in "cutting" the drugs, Evans and Webber sought and found two women who could prepare the cocaine. These women spent several hours packaging a large quantity of "crack" cocaine while Evans instructed Civil on methods of selling drugs on the street.
 
 
 5
 Evans later accused Civil of stealing some of the drugs, pointed a gun at Civil's head, forced him to strip, and beat him with a belt. Curren and Webber, who had been sleeping, were awakened by Civil's screams, and Evans told them that Civil had stolen some of the drugs. Webber and Curren then pointed guns at Civil, while Webber and Evans discussed what to do with him. Fearing for his life, Civil agreed to go with the others to Washington, D.C. to sell narcotics.
 
 
 6
 On March 6, 1988, appellants and Civil concealed the cocaine and guns in a black knapsack with Evans' nickname "Sha" painted on it. The four took the knapsack and rode in a taxi to pick up another individual, Fenty. Appellants, Civil, and Fenty then rode to the bus station where Evans purchased tickets for all five to Washington, D.C. They left New York at approximately 6:00 p.m. and arrived in Washington sometime after 9:00 p.m.
 
 
 7
 When the group arrived in Washington, Evans led them to an apartment belonging to Brenda Taylor. At Taylor's, Evans removed a portion of the cocaine from the knapsack and told the others how to sell it. Webber, Curren, Fenty, and Civil then spent the entire day selling cocaine on Fourth Street, Southeast. Webber supervised the others, distributing to each only five bags of crack at a time and collecting the proceeds before dispensing additional drugs. Evans also appeared periodically to supervise the operation. The group returned to Taylor's apartment around 11:00 that night, after selling at least $2,000 worth of cocaine, and Webber turned the receipts over to Evans.
 
 
 8
 That night, in a dispute, Evans pointed a small black revolver at Civil, tied him up with a piece of telephone cord, and threatened to kill him. The next morning, when Civil stated that he wanted to return to New York, Evans beat Civil with a crutch while Webber and Curren prevented Civil from leaving.
 
 
 9
 Later, on the morning of March 7, 1988, Webber, Curren, Fenty, and Civil returned to Fourth Street to sell cocaine. Civil escaped to a fire station and contacted the police who quickly responded. Police officers arrested the appellants on Fourth Street; then, with Taylor's consent, they searched Taylor's apartment. In the room where Evans, Curren, and Webber had slept, the police found three guns, more than $2,000 in cash, some loose cocaine, and 345 grams of "crack" cocaine, worth approximately $56,000, individually packaged into 1,090 bags. At least one of the guns and most of the pre-packaged cocaine were found inside the black knapsack appellants had brought with them from New York.
 
 
 10
 At trial, Civil testified that he recognized all three guns from New York, and he specifically identified two of the guns as those used by Evans, Webber, and Curren. Brenda Taylor corroborated much of Civil's story and testified that Evans, Civil, and Curren had sold her some cocaine in her apartment. Finally, the government introduced evidence that none of the guns was registered to any of the defendants in the District of Columbia.
 
 
 11
 II. JURY INSTRUCTION ON USING OR CARRYING A FIREARM IN
 
 RELATION TO A DRUG-TRAFFICKING OFFENSE
 18 U.S.C. Sec. 924(c)(1) provides:
 
 12
 Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years....
 
 
 13
 The District Court instructed the jury that in order to convict a given defendant on this count the jury must find beyond a reasonable doubt that, during and in relation to a drug-trafficking offense, defendant knowingly carried a firearm. The Court explained, "In order to satisfy this element, the government need not show that the defendant actually carried the firearm on his person. It is sufficient if you find that he transported or conveyed the weapon or had possession of it in the sense that it was accessible and within reach." (Tr. 1510).[1] Curren contends that this instruction was erroneous because it permitted the jury to find that Curren carried a firearm if it found simply that a firearm was accessible and within reach; Curren argues that the jury may have found him guilty of this offense based solely on his sleeping in the same room as the knapsack.
 
 
 14
 Because Curren did not raise this objection at trial, his challenge is subject to "plain error" review under Fed.R.Crim.P. 52(b). See United States v. Wiggins, 530 F.2d 1018, 1020 (D.C.Cir.1976). Not only did Curren's trial counsel not object to the Court's statement that "carrying" could include possession in the sense that the weapon was "within reach," but he agreed that "carrying" means "within reach" in the sense of "within arm's reach" (Tr. 1182).[2] Further, Curren's trial counsel did not object to the instruction concerning the meaning of "carry" when appellants were given an opportunity "to preserve whatever objections they may have made earlier for the record" (Tr. 1518) at the completion of the instructions.
 
 
 15
 Other circuits have recognized that "carry," as defined for the purposes of section 924(c)(1), need not be read in a "hypertechnical or narrow" way. See United States v. Raborn, 872 F.2d 589, 595 (5th Cir.1989) (the element of carrying "does not depend on proof that the defendant had actual possession of the weapon or used it in any affirmative manner, but it does require evidence that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking" (footnote omitted));[3] United States v. Cardenas, 864 F.2d 1528, 1535-36 (10th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989) (though merely "transporting" is not "carrying," "carrying" can include "carrying in a vehicle," or "transporting while in possession"); United States v. Stewart, 779 F.2d 538, 539 (9th Cir.1985) (had the jury been properly instructed on the "during a felony" element of Sec. 924(c)(2) (1982), the defendant could have been convicted for carrying a firearm under this statute where a rifle was under his control in the trunk of his car); United States v. Barber, 594 F.2d 1242, 1244 (9th Cir.), cert. denied, 444 U.S. 835, 100 S.Ct. 69, 62 L.Ed.2d 46 (1979). A defendant may be convicted for "carrying" a weapon even if the weapon was not immediately on that defendant's person. Id. at 1244 ("carry" can include "transport" or "possess" in circumstances where the defendant has access to the gun). Thus, although "carrying" for section 924(c)(1) purposes may not be synonymous with "having constructive possession," it clearly comprehends more than actually physically wearing or bearing a gun on one's person.
 
 
 16
 In this case, there is no direct evidence that Curren actually bore a gun on his person while in D.C. However, the prosecution offered evidence from which the jury could conclude that Curren had access to a gun, as Barber had access to his in Barber, while it was being transported to and within the District of Columbia. Moreover, the jury could properly infer that while staying in Taylor's apartment, Curren "carried" the gun in the sense that it was within reach and available to protect him during his ongoing crime of possession with intent to distribute cocaine.
 
 
 17
 The District Court's instruction in this case, taken as a whole, made it clear that the jury could not convict a defendant for just sleeping in the same room as the guns. An object is "accessible" or "within reach," as commonly understood, if a party is not just near it, but has a present ability to exercise dominion and control over it. Moreover, the Court instructed that in order to convict a defendant for carrying a firearm in connection with a drug-trafficking offense the jury had to find that the defendant had knowledge that he was carrying a firearm (Tr. 1509).
 
 
 18
 We do not endorse the District Court's instruction to the extent that it may imply that "constructive possession" and "carrying" are the same. However, because a defendant can be deemed to be "carrying" a weapon, even if it is not worn or held directly on that defendant's person; because there was sufficient evidence from which the jury could conclude that Curren had something approaching actual possession of the gun during the commission of the predicate drug offense; and because the District Court's instructions, taken as a whole, made it clear that the jury could not convict a defendant for merely being near the guns, we find that the District Court's instruction in this case did not constitute plain error.
 
 III. SUFFICIENCY OF THE EVIDENCE
 A. Possession with Intent to Distribute
 
 19
 Possession of drugs for the purposes of 21 U.S.C. Sec. 841(a)(1) can be constructive as well as actual. United States v. Raper, 676 F.2d 841, 847 (D.C.Cir.1982). Where there is direct or circumstantial evidence that the defendant knowingly had an ability to exercise dominion and control over contraband, a jury may convict on a constructive possession theory. Id. at 847; United States v. Lawson, 682 F.2d 1012, 1017 (D.C.Cir.1982); United States v. Staten, 581 F.2d 878, 883 (D.C.Cir.1978). A defendant cannot be convicted on a constructive possession theory based on mere proximity to the drugs or association with others in possession of them. United States v. Pardo, 636 F.2d 535, 549 (D.C.Cir.1980); United States v. Foster, 783 F.2d 1087, 1089 (D.C.Cir.1986). However, such proximity or association "may establish a prima facie case of drug-possession when colored by evidence linking the accused to an ongoing criminal operation of which that possession is a part." Staten, 581 F.2d at 885 (footnote omitted).
 
 
 20
 We find, viewing the evidence in the light most favorable to the government and drawing all legitimate inferences from that evidence, Pardo, 636 F.2d at 547, that the judgments of conviction for possession with intent to distribute were supported by sufficient evidence. The government's evidence tends to show that all three defendants were knowing, active participants in the entire drug-distribution enterprise. This evidence itself may be enough to show constructive possession. Staten, 581 F.2d at 885.
 
 
 21
 More specifically, the government offered evidence that Evans solicited Civil's participation in the enterprise (Tr. 135-37), instructed the others about the business of selling drugs (Tr. 139-40), directed the packaging of the drugs (Tr. 139), removed some cocaine from the knapsack once they got to the District of Columbia (Tr. 147-48), and, most important, oversaw the distribution of the drugs in the street (Tr. 149). The government offered evidence that Webber assisted Evans in overseeing the packaging of the drugs (Tr. 139-41) and managed the street distribution (Tr. 148-49). Finally, the government offered evidence that Curren helped protect the drugs (Tr. 142), that he sold Taylor cocaine from the knapsack at her apartment in the District of Columbia (Tr. 282, 662-63), and that he sold some of the cocaine on the street in D.C. (Tr. 148). From this evidence, the jury could reasonably infer that each appellant had at least constructive possession of the cocaine stash.
 
 
 22
 B. Using or Carrying a Firearm in Connection with a Drug-Trafficking Offense
 
 
 23
 Firearms actually need not be brandished in order to be used or carried in connection with a drug-trafficking offense. United States v. Matra, 841 F.2d 837, 841-43 (8th Cir.1988); United States v. Mason, 658 F.2d 1263, 1270-71 (9th Cir.1981); United States v. Moore, 580 F.2d 360, 362 (9th Cir.), cert. denied, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978). Although the mere presence of a gun near the commission of a felony may not be sufficient to show that the gun was carried in relation to that felony, United States v. Robertson, 706 F.2d 253, 256 (8th Cir.1983), when guns are present in order to protect contraband they may be deemed to be used in relation to the underlying felony. Matra, 841 F.2d at 841-43.
 
 
 24
 The government offered sufficient evidence from which the jury could infer that Evans and Curren carried or used firearms during or in relation to their ongoing offense. The guns were brought from New York along with the drugs, supporting the theory that the guns were for protecting the drugs. Moreover, Civil testified that on two different occasions Evans pointed a gun at him (Tr. 141, 151), and on one occasion, in New York, Curren pointed a gun at him (Tr. 142). This evidence suggests that the guns were, in fact, used to protect the drug stash.
 
 C. Possessing Unregistered Firearms
 
 25
 There was ample evidence from which the jury could infer that all three defendants constructively possessed all three guns.[4] The government presented evidence that Evans, Curren, and Webber were engaged in a common enterprise. From this evidence a jury could reasonably infer that all three shared direct access to, and dominion and control over, the knapsack which contained the guns and that each of the three exercised some control over the guns, personally and through his confederates. Further, the government also presented evidence that each defendant brandished a gun on at least one occasion, from which the jury could properly infer that each defendant constructively possessed at least one gun throughout the course of the drug-distribution enterprise.
 
 
 26
 Webber challenges the sufficiency of the government's evidence that the guns were not registered. At trial on June 8, 1988, the government offered a certification dated March 8, 1988, that the firearms in question were not registered to Kerry Webber. On March 10, 1988, Webber had notified the Court and government that his real name was David Richardson. Webber argues that the record search shows nothing more than that the guns were not registered to a fictitious person named Kerry Webber, so the government has not offered sufficient evidence to show that the guns were not in fact registered to him.
 
 
 27
 Although technically hearsay, evidence of the absence of a record is admissible under Fed.R.Evid. 803(1) provided that a diligent search for the record has proved fruitless. In United States v. Yakobov, 712 F.2d 20 (2d Cir.1983), the court held that the record search wherein the defendant's name was egregiously misspelled was not diligent, as required by Fed.R.Evid. 803(10), and therefore constituted inadmissible hearsay. Because Webber did not object to the introduction of this record at trial, Yakobov is inapposite. Although the government's search in this case may have been less than diligent, in light of the defendant's failure to object to the introduction of the certificates, and given the ambiguity in the record as to Webber's "real " name, we cannot hold, sua sponte, that the District Court's introduction of the evidence constituted plain error.
 
 
 28
 Once the certificates were introduced, it was up to the jury to weigh their probative value. United States v. Carter, 801 F.2d 78, 85 (2d Cir.), cert. denied, 479 U.S. 1012, 107 S.Ct. 657, 93 L.Ed.2d 712 (1986). Webber was free to present his argument to the jury and offer evidence that his real name was something other than "Kerry Webber." In fact, counsel's assertions aside, the record contains little evidence from which the jury could conclude that the defendant's name was anything other than Kerry Webber. From the evidence the jury could properly conclude beyond a reasonable doubt that if none of the guns was registered to the name "Kerry Webber," then none of the guns was registered to the defendant.
 
 IV. OTHER CLAIMS
 
 29
 Appellants' other challenges merit only brief mention. Webber contends that due to the government's inadvertent belated disclosure of certain evidence, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was entitled to a mistrial.[5] However, after the evidence was discovered and the possibility of a mistrial was discussed, Webber himself specifically stated, on the record, that he did not wish to seek a mistrial (Tr. 1422). We refuse to hold that the District Court erred by not, on its own initiative, ignoring the express wishes of the defendant and granting a mistrial.
 
 
 30
 Moreover, even if we were to reach the merits of Webber's Brady claim, we could not find that the District Court erred in concluding, after a hearing, that the late-discovered evidence would not have helped defendant's case (R. 52).
 
 
 31
 Finally, Evans contends that the District Court erred by permitting a witness, who had allegedly been threatened by a person allied with one or more of the defendants, to testify without conducting a voir dire of that witness to determine whether the threat had affected her mental attitude and ability to testify fairly. While the threats against the witness were clearly a proper basis for cross-examination, they in no way undermined her competence to testify. We know of no authority requiring that a witness, as opposed to a juror, be impartial. Moreover, given that the witness's testimony was consistent with statements she made before being threatened, there was no evidence that the threats affected her testimony at all.
 
 V. CONCLUSION
 
 32
 For the foregoing reasons, we reject appellants' challenges and affirm the judgments of the District Court.
 
 
 
 [1]
 Transcript citations ("Tr.") are to the sequentially numbered pages of the trial transcript. Record citations ("R.") are to the sequentially numbered pages of the record
 
 
 [2]
 Trial counsel did make a closely related objection to the District Court's refusal to instruct the jury that the firearm had to be "readily accessible" (Tr. 1181)
 
 
 [3]
 Arguably the Fifth Circuit was defining the term "use or carry" collectively, but the language preceding the quoted statement strongly implies that the court was construing the particular term "carry."
 
 
 [4]
 The District of Columbia recognizes the doctrine of constructive possession with respect to firearms. Curry v. United States, 520 A.2d 255, 263 (D.C.App.1987)
 
 
 [5]
 Webber contends that, in the alternative, he is entitled to dismissal. Our research indicates, however, that where a Brady violation requires a remedy, relief is afforded by mistrial rather than dismissal. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1971)