**UNITED STATES of America, Appellee,**

v.

**Ralph Chavous DUKE, a/k/a Plookie, a/k/a Plukey, Appellant.**

**No. 90–5322.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1991.

Decided July 23, 1991.

Rehearing and Rehearing en banc Denied Sept. 17, 1991.

F. Clayton Tyler, argued (F. Clayton Tyler and Hersch Izek, on brief), Minneapolis, Minn., for appellant.

Jon M. Hopeman, argued (Jerome G. Arnold, Jon M. Hopeman and Denise Reilly, on brief), Minneapolis, Minn., for appellee.

Before FAGG and BEAM, Circuit Judges, and HEANEY, Senior Circuit Judge.

BEAM, Circuit Judge.

Ralph "Plukey" Duke appeals from his convictions following a one-month long jury trial. Duke was convicted of all counts with which he was charged in a multi-defendant, multi-count indictment. Specifically, Duke was convicted of participating in a continuing criminal enterprise to possess and distribute cocaine in violation of 21 U.S.C. § 848 (1988) (count 1); of aiding and abetting the attempt to possess with intent to distribute twenty kilograms of cocaine on May 17, 1989, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988) and 18 U.S.C. § 2 (1988) (count 2); of other instances of aiding and abetting the posses-

sion with intent to distribute smaller quantities of cocaine on various dates in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (counts 4, 5, 6, 7, 8); of three counts of using or carrying a firearm during and in relation to a drug trafficking offense all in violation of 18 U.S.C. § 924(c)(1) (1988) (counts 28, 29, 30); and of conspiracy from 1984 to May 18, 1989, to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 (count 32). Duke received separate life sentences on counts 1, 2, and 32, and forty-year sentences on each of counts 4–8. These sentences were all concurrent. In addition, Duke was sentenced to mandatory consecutive sentences of thirty years, five years, and five years, respectively, on counts 28, 29, and 30.

On appeal, Duke argues that his convictions for both continuing criminal enterprise and conspiracy violate the double jeopardy clause of the fifth amendment; that the evidence was insufficient to convict him of the twenty-kilogram transaction; that the evidence does not support the firearm convictions; and that he received ineffective assistance of counsel at trial. Because we agree that the convictions for both continuing criminal enterprise and conspiracy violate his fifth amendment rights, we remand this case to the district court to vacate one of the convictions. In all other respects, we affirm.

## I. BACKGROUND

The evidence presented at the trial of Duke and five others involved in his drug dealings established that Duke headed a conspiracy to distribute drugs in the Twin Cities. Duke maintained several houses in Minneapolis and St. Paul, many of them providing housing for those who worked for him, as well as a house in Los Angeles, where he purchased much of the cocaine he distributed in Minnesota. Duke's normal methods involved purchasing cocaine directly from a Columbian source, receiving it in either Texas or Los Angeles, and then transporting it by car to Minnesota. Once in Minnesota, the cars were often unloaded at Duke's country estate in Delano, just west of Minneapolis. From there, the co-

caine would be distributed to other members of the conspiracy who would sell it on the streets of the Twin Cities.

The operation was huge. Ralph Lamont Nunn (Monte Nunn), Duke's son, told the government's undercover informant, Andrew Chambers, that his father controlled much of the drug trade in the Twin Cities and could easily sell seventy-five kilograms in two or three months. Trial Transcript vol. 2, at 146; Exhibit 2A. Marvin McCaleb, a Los Angeles drug dealer with whom Duke conspired to sell cocaine from approximately June through December 1988, testified that during that period he and Duke sold twenty-five kilograms a week and made a profit of between $600,000 to $1,000,000 each. Trial Transcript vol. 7, at 194; see id. vol. 4, at 109. To distribute this much cocaine, Duke relied on a host of people, including his son, Monte Nunn; Loren Duke, Duke's nephew, who drove cars cross-country and who often took cash to local car dealers for laundering; and Joseph Ballard, who lived in Duke's Delano house and who made many cross-country trips.

The arrests in this case followed a reverse sting operation involving Monte Nunn and Andrew Chambers. Chambers, who worked for the Drug Enforcement Administration, first met Monte Nunn in May 1989 after working for several months trying to infiltrate the area drug culture. Chambers told Monte that he was from Los Angeles, had drugs to sell in Minnesota, and sold only in large quantities. Monte assured Chambers that his father could distribute as much cocaine as he could sell. The two exchanged phone numbers.

They met again several days later, on May 10, 1989, at a gas station. There, Monte got into Chambers's car, which had been equipped with a tape recorder, and the two drove around and talked for almost two hours. Their recorded conversation, during which they discussed the sale of twenty kilograms at about $14,000 per kilo, was played to the jury, see exhibits 2A and 2B, as were portions of several other conversations recorded between May 10 and May 17, the date of the twenty-kilogram

transaction. They met again on May 16, and their conversation was again recorded. See exhibit 3.

On May 17, Chambers called Nunn and they arranged to meet at a car wash in the afternoon. From there, they went to a Hilton hotel, where Chambers showed Monte twenty kilograms in the trunk of his car. Nunn picked out three packages and they went inside to a room wired for audio and video surveillance, where Nunn cut and tested the cocaine. Their conversation after they left the hotel was again recorded and played to the jury. See exhibit 49. Chambers and Nunn agreed that Nunn would call Chambers later that day when he had collected the money.

Loren Duke testified that he met Nunn that afternoon at a motorcycle shop and that they went to Loren's house, where Nunn received a call from Chambers at about 6:00 p.m. Nunn told Chambers he was getting the money together and would call him. At about 10:00 p.m., Nunn left to make a call from a pay-phone; he came back twenty minutes later with almost $120,000 in cash. Nunn and Loren counted the money, called Chambers, and then left with two others for the Hilton. There they presented Chambers with $117,754 in a shoe box wrapped in a green bag, and were promptly arrested. The police arrested Ralph Duke later that day and executed search warrants at four houses, including the Delano house, on May 18, 1989.

## II. DISCUSSION

### A. Twenty-kilogram Transaction

We begin with Duke's argument that "the State has failed to provide any evidence to show that Ralph Duke was involved in aiding and abetting anyone to possess 20 kilograms of cocaine on May 17, 1989." Brief for Appellant at 21. Duke argues that there is simply no evidence connecting him to the transaction arranged between Nunn and Chambers. For instance, Duke points out that, while Nunn spoke to Duke on two occasions while he was meeting with Chambers, Chambers himself never spoke to Duke, nor could Chambers say that Nunn and Duke dis-

cussed the twenty-kilogram transaction. "I never seen him talk to his father about what we were talking about." Trial Transcript vol. 3, at 129. Duke also points out that there was no physical evidence connecting Duke to the money used to make the purchase. His fingerprints were not found on the money or the containers. In short, Duke argues, nothing establishes any connection between him and the transaction.

■ To sustain Duke's conviction for aiding and abetting the attempt to possess with intent to distribute cocaine, the government must prove more than Duke's mere association with Chambers and Nunn or his mere knowledge of their transaction. *See United States v. Grey Bear*, 828 F.2d 1286, 1292–93 (8th Cir.1987), *vacated in part*, 836 F.2d 1088 (8th Cir.1987). Rather, the government must prove: "(1) that the defendant associated himself with the unlawful venture; (2) that he participated in it as something he wished to bring about; and (3) that he sought by his actions to make it succeed." *United States v. Lanier*, 838 F.2d 281, 284 (8th Cir.1988) (citing *United States v. Sopczak*, 742 F.2d 1119, 1121–22 (8th Cir.1984)). The government must prove some "affirmative participation which at least encourages the perpetrator." *United States v. Ivey*, 915 F.2d 380, 384 (8th Cir.1990).

■ Duke alleges that the evidence was insufficient to prove any such active, affirmative participation. When reviewing his argument, "we examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences." *Id.* at 383. We can reverse only if "a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." *Id.* While it is a close question, given only the circumstantial evidence indicating that Nunn purchased the cocaine for Duke with Duke's money, we cannot say that a reasonable fact-finder

must have had a doubt that Duke participated in and encouraged this transaction.

The jury heard several recorded conversations in which Nunn, although equivocally, implicated his father in the transaction. In their first recorded conversation, on May 10, 1989, Chambers asked Nunn what his father thought about the proposed deal:

[Chambers]: Ah, how your father feel about us hookin up?

Mont[e]: He's fine.

[Chambers]: Okay.

Mont[e]: He don't mind he's cool with it. He might wanna get some, you know.

Court 2A at 27.[1] On May 16, Chambers asked Nunn whether he could buy all twenty kilograms. Nunn eventually replied that his problem was a lack of money: "See the problem I have I don't have any money here. See the money I did have was in my crib, you know.... I got some money but it ain't here. It's in a different state. I don't feel like touchin it, you know." Court 3 at 4. Finally, as they left the Hilton on May 17 after Nunn tested the cocaine, Chambers suggested that he could sell to Nunn and Nunn could resell to his father at a higher price:

[Chambers]: And you think he'll hop on em.

Mont[e]: He'll hop on em.

[Chambers]: Shit man, tell him!

Mont[e]: I am, I told him, he's gettin his money together.

Court 49 at 2.

Moreover, Loren Duke testified that Monte Nunn told him that the money came from Duke. When Loren ran into Nunn on May 17, Nunn told Loren that someone was in town with twenty kilos and "that his father told him to go get the twenty kilos because he wanted to buy them." Trial Transcript vol. 4, at 140. When Nunn then went to Loren's house, Loren said that Nunn "told me that he didn't have no money to get the stuff—the only reason why

1. In addition to the recorded conversations, which were admitted as evidence at trial, the court also allowed the jury to follow along with a transcript of the recording, which the court warned the jury was not evidence. *See, e.g.,* trial transcript vol. 2, at 136. Thus, each tape-recorded exhibit had a corresponding transcript: Exhibit 2A is the tape, Court 2A is the transcript. Our quotations here are, of necessity, from the transcript.

we was going to get the stuff was because his dad wanted it." *Id.* at 142. And on cross-examination, Loren was asked why he and Nunn counted the money before going to the Hilton: "Q: Now you are not trying to tell this jury that Mont[e] was counting money that you claim he got from his father, are you? A: That's what I heard." *Id.* vol. 5, at 99. He repeated that Nunn had told him that. *Id.*

The sudden appearance of $120,000 on the night of May 17 also suggests that it came from Duke and was not Nunn's own money. According to Chambers, Nunn told him around 6:00 p.m. that "he was getting the money together, and that he would have it together; and as soon as he got it, he would call me." *Id.* vol. 3, at 13. Nunn was with Loren Duke at Loren's house from then until 10:00, when he left for about twenty minutes. He came back with $120,000. "Q: ... Just, all of a sudden, the money was there? A: It was there." *Id.* vol. 5, at 114. As indicated, Nunn also told Chambers that he had no money. Clearly, someone gave Nunn the money.

Given Nunn's statements implicating Duke and the wealth of evidence proving Duke's position at the head of the conspiracy, it seems a reasonable inference that Nunn made the purchase for his father with his father's money. As this court has held, the evidence of Duke's involvement in this transaction can be "viewed in the light of the evidence establishing [his] involvement in the conspiracy." *Ivey,* 915 F.2d at 384. *Cf. United States v. Robinson,* 782 F.2d 128, 130 (8th Cir.1986) (evidence of other crimes relevant to "'complete the story of the crime on trial by proving its immediate context'" (quoting *Carter v. United States,* 549 F.2d 77, 78 (8th Cir. 1977))). We think that this evidence—that Nunn talked to his father twice while talking to Chambers, that Nunn told Chambers that his father was getting his money together and Loren Duke that the money came from his father, that the money suddenly appeared in Nunn's hands, and that Duke was the dominant figure in the conspiracy—is sufficient to support Duke's conviction on count 2.

## B. Firearm Convictions

We also reject Duke's argument that he was wrongly convicted of the three different counts alleging violations of 18 U.S.C. § 924(c)(1). In count 28, Duke was charged with using a .22 caliber pistol with a silencer attached during and in relation to either the continuing criminal enterprise or the conspiracy. The pistol was seized on May 18, 1989, from a storage unit in Minneapolis. The other two guns, charged in counts 29 and 30, were an unloaded revolver found in a hollowed-out book in the master bedroom of the Delano house and a loaded semi-automatic weapon found in the master bedroom's bathroom. Duke argues that there was no evidence of drug transactions at the Delano house from which the jury could find that the guns were used during and in relation to the conspiracy, and that he could not have used them on May 18, 1989—the date charged in the indictment—because he was in custody as of May 17.

■ Duke rightly points out that mere possession of a firearm is not sufficient to constitute use during and in relation to a drug offense. *United States v. Lyman,* 892 F.2d 751, 752 (8th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990). A weapon need not be actually brandished or discharged to be used, however, so long as "it was an integral part of [the defendant's] criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed." *United States v. Matra,* 841 F.2d 837, 843 (8th Cir.1988). In drug-trafficking crimes, firearms are often used for protection or intimidation; their "presence and availability in light of the evident need demonstrates the use." *United States v. LaGuardia,* 774 F.2d 317, 321 (8th Cir.1985). *Accord United States v. Michaels,* 911 F.2d 131, 132 (8th Cir.1990) ("[I]f a gun [was] available to the defendant, and if the gun was an integral part of the crime and increased the likelihood of its success, then it was used during and in relation to the crime."), *cert. denied,* —— U.S. ——, 111 S.Ct. 981, 112 L.Ed.2d 1066 (1991). Thus, we held in *Matra* that, be-

cause they are available to protect and intimidate, firearms found in drug houses resembling armed fortresses are used within the meaning of section 924(c). *See Matra*, 841 F.2d at 842.

As in *Matra*, the guns charged in counts 29 and 30 were found in an armed fortress, Duke's Delano house. The jury heard evidence that the Delano residence was a country house situated on two acres and surrounded by a chain-link fence. Entry could be gained only through a gate electronically controlled from within the house. Two exterior surveillance cameras, monitored from the master bedroom where the guns were found, scanned outside the house, and three large guard dogs patrolled the grounds. The police found a scanner in the kitchen and plastic baggies containing cocaine residue. The jury also heard evidence that large quantities of cocaine were stored and processed through the Delano house after their cross-country transport in one of Duke's cars, and that large amounts of cash were often counted at the Delano house.

Thus, if Duke argues that the presence of the guns at the Delano house can constitute use within section 924(c) only upon proof of drug sales from the house, *see* brief for appellant at 33 ("There is ... no evidence of any drug trafficking in Duke's Delano home."), we have already specifically rejected his argument. *See United States v. Curry*, 911 F.2d 72, 79 (8th Cir. 1990) (citing *LaGuardia*, 774 F.2d at 321) (section 924(c)(1) does not require that drug transactions take place in the residence where the guns were found), *cert. denied,* —— U.S. ——, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991). If he contends merely that the Delano house was not a distribution center for the conspiracy, the evidence is flatly to the contrary.

Duke's argument that the pistol with silencer, charged in count 28, was not used during and in relation to the conspiracy is little better. In the spring of 1988, Duke called his nephew, Joseph Ballard, and told him to pick up the pistol from Marcel Duke. Ballard delivered the gun to Duke at the Delano house, where Duke "loaded it, and showed it to his friend Marvin [McCaleb], and went out in the yard, and shot it a few times." Trial Transcript vol. 7, at 88. During the six to eight weeks when the gun was kept at the Delano house, Duke also fired it in the presence of his Columbian source. *Id.* vol. 7, at 206–07. At some point, Duke had Ballard take the gun to the storage unit where it was seized on May 18, 1989.

Duke argues that because the gun was not at the Delano house when it was seized, it was not used during and in relation to the conspiracy. The conspiracy charged in the indictment, however, began in 1984 and ran until May 18, 1989. Thus, use of the gun within the meaning of section 924(c) could occur anytime within the conspiracy. We think that the two occasions when Duke fired the gun in the presence of others constitute actual use within section 924(c); the public act of firing a pistol with a silencer can only be an advertisement of its availability if needed—clearly the sort of intimidation contemplated by our cases. *See, e.g., LaGuardia*, 774 F.2d at 321. *Cf. United States v. Evans*, 888 F.2d 891, 896 (D.C.Cir.1989) (although actual use not needed under section 924(c), act of pointing gun at government informant and co-defendant on two different occasions "suggests that the guns were, in fact, used to protect the drug stash"), *cert. denied,* —— U.S. ——, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990). We think that Duke actually used the gun during and in relation to the conspiracy regardless of its location when it was seized.

Duke also argues that, because he was arrested and in custody as of May 17, 1989, he could not have committed any of the section 924(c) offenses, all of which the indictment charges occurred "on or about the 18th day of May, 1989." His argument is without merit as to the guns found in the Delano house. Their presence and availability at the drug-distribution center constitutes use within section 924(c). Because the conspiracy continued to May 18, 1989, their presence on May 18, 1989, means they were used on that day. Even if Duke were correct that he could not use the guns after

he was in custody, however, his argument overlooks the language of the indictment. That is, the indictment charges that the guns were used "on or about" May 18, 1989. The law is clear that the use of "on or about" in an indictment relieves the government of proving that the crime charged occurred on a specific date, so long as it occurred within a reasonable time of the date specified. *See United States v. Williams*, 657 F.2d 199, 202–03 (8th Cir. 1981) (approving an instruction to that effect). *See also United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir.1989) (use of "on or about" puts defendant on notice that charge not limited to date in indictment; proof of date reasonably near sufficient), *cert. denied*, —— U.S. ——, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *United States v. Leibowitz*, 857 F.2d 373, 379 (7th Cir.1988) (same), *cert. denied*, 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989); *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir.) (same), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987).

Duke's argument has more merit as to count 28 because his acts of firing the weapon occurred sometime in 1988. At best, however, Duke's argument establishes a variance between the proof at trial and the date charged in the indictment.

> "[A] variance between the date in the pleading and the proof is not fatal if the proof shows that the acts charged were committed within the period of the statute of limitations and prior to the date of the [indictment], as long as the date is not a material element of the offense, and the defendant is not prejudiced."

*United States v. Collins*, 690 F.2d 670, 673 (8th Cir.1982) (quoting *United States v. Johnson*, 576 F.2d 1331, 1332 (8th Cir.1978) (per curiam)). *Accord United States v. Holtzen*, 718 F.2d 876, 878 (8th Cir.1983). A defendant is not prejudiced when he "could reasonably have anticipated the evidence presented at trial from the indictment." *United States v. Shyres*, 898 F.2d 647, 653 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). *See also United States v. McMahan*, 744 F.2d 647, 651 (8th Cir.1984) (variance does not deprive defendant of constitutional rights if apprises defendant of the charges against him and allows counsel to prepare for trial effectively). Duke does not argue that the indictment prevented him from presenting an effective defense to the crime charged in count 28.

### C. Double Jeopardy

We agree with Duke that his convictions of both count 1, engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, and count 32, conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, violate the double jeopardy clause of the fifth amendment. On appeal, the government concedes error. Indeed, the Supreme Court held in *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), with reference to the same statutes at issue here, "that Congress did not intend to impose cumulative penalties under §§ 846 and 848." *Id.* at 157, 97 S.Ct. at 2220. *Accord United States v. Maull*, 806 F.2d 1340, 1347 (8th Cir.1986), *cert. denied*, 480 U.S. 907, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987). Moreover, the Court has made it clear that the second conviction and not merely the second sentence violates the double jeopardy clause. "The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence." *Ball v. United States*, 470 U.S. 856, 864–65, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985). *See also United States v. Mendoza*, 902 F.2d 693, 697–98 (8th Cir.1990). That the district court ordered the life terms to run concurrently, then, does not obviate the constitutional violation.

### III. CONCLUSION

Duke also argues on appeal that he received ineffective assistance of counsel at trial. We will not consider an ineffective assistance claim not first presented to the district court and on which a proper record has not been made. *United States v. Schmidt*, 922 F.2d 1365, 1369 (8th Cir. 1991); *United States v. Blackman*, 904 F.2d 1250, 1259–60 (8th Cir.1990). *But cf. United States v. Ford*, 918 F.2d 1343, 1350

(8th Cir.1990) (considering ineffective assistance claim on direct appeal because "all the relevant facts are known and the government does not object to the claim"). We have considered Duke's other arguments on appeal and find them to be without merit. Accordingly, we remand this case to the district court to vacate Duke's conviction for either count 1 or count 32. In all other respects, the judgment of the district court is affirmed.