978 F.2d 415
 UNITED STATES of America, Appellee,
v.
Duane Dale DAVIS, Appellant.
 No. 91-2162.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 11, 1992.
Decided Oct. 28, 1992.
 
 David A. Butler, Des Moines, Iowa, argued, for appellant.
 Robert L. Teig, Cedar Rapids, Iowa, argued, for appellee.
 Before RICHARD S. ARNOLD, Chief Judge, McMILLIAN, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, and HANSEN, Circuit Judges, En Banc.
 BEAM, Circuit Judge.
 
 
 1
 A jury found Davis guilty of manufacturing and selling a device used for the unauthorized decryption of satellite cable programming, in violation of 47 U.S.C. § 605(e)(4); unauthorized reception of encrypted radio communications, in violation of 47 U.S.C. § 605(a); copyright infringement, in violation of 17 U.S.C. § 506; manufacturing and selling an electronic device primarily useful for the surreptitious interception of electronic communications, in violation of 18 U.S.C. § 2512(1)(b); and interception of encrypted electronic communications, in violation of 18 U.S.C. § 2511(1)(a). Davis appeals his convictions under 18 U.S.C. §§ 2511 and 2512, claiming that his conduct is outside the scope of these statutes.
 
 
 2
 In United States v. Hux, 940 F.2d 314 (8th Cir.1991), a panel of this court held that the manufacture of a satellite descrambler was not a violation of 18 U.S.C. § 2512(1)(b). We overrule Hux in this respect and affirm Davis's convictions.
 
 I. BACKGROUND
 
 3
 In the early to mid-1980's, a predecessor to General Instruments Corporation (GI) was asked to develop a system to allow cable television providers transmitting their signal via satellite to collect a fee from owners of satellite-signal reception systems. The system developed by GI was comprised of a microprocessor chip and a descrambler module, and in its current form is referred to as the VideoCipher II (VCII). Each VCII has a unique address, much like a telephone or social security number, that allows the satellite to send a personalized message to each unit. This message enables a VCII to unscramble or decrypt only those signals that the subscriber pays for. In practice, a subscriber contacts the marketing arm of the satellite programming provider, requests access to certain programming, and gives the provider his VCII's unit address. The satellite then sends a signal to that specific unit, enabling it to descramble or decrypt the signal carrying the program. Because each unit has a unique address, units may be individually enabled and disabled with programming tailored to the specific request of the individual subscriber.
 
 
 4
 The intelligence allowing the VCII to carry out its function is contained in the microprocessor chip. GI sought to prevent tampering with this chip by covering it with an epoxy resin. Unauthorized descrambling or decrypting of programming, or video piracy as it is commonly referred to, requires accessing and replacing this chip. Usually, the epoxy resin is melted and chipped away and a new microprocessor chip is substituted. Two common methods of video piracy are referred to as "cloning" and "3 Musketeers."
 
 
 5
 In cloning, the modified device is given the same address as a device legitimately authorized to descramble or decrypt particular satellite signals. Since there is no method by which the transmitting satellite can determine that more than one VCII has the same address, both the legitimate and all cloned units descramble or decrypt the same signals. Using the "3 Musketeers" method, a unit authorized to descramble or decrypt one signal is modified so as to descramble all programs. This method is referred to as the "3 Musketeers" because, like Dumas's selfless, royal bodyguards, it is one for all (authorization to descramble one program) and all for one (descrambles all programs).
 
 
 6
 Using a combination of the methods described above, Davis began illegally modifying and selling VCII units as early as 1987. Davis sold units directly to users and to subdealers. At his trial, thirteen customers and subdealers testified about the units they had bought from him.
 
 II. DISCUSSION
 
 7
 A. Is Davis's Conduct Covered by the Wiretap Act?
 
 
 8
 First, Davis contends that section 2511(1)(a), which makes it unlawful for any person to intentionally intercept electronic communications,[1] is inapplicable to the interception of commercial satellite programming. As authority for his allegation, Davis cites a number of district and circuit court cases. These cases, however, were decided before the 1986 amendments to the Wiretap Act that expanded its scope to include electronic communications. See Electronic Communications Privacy Act of 1986 [hereinafter ECPA], Pub.L. No. 99-508, § 101(a)(6)(C), 100 Stat. 1848. The Wiretap Act defines electronic communications as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, [or] electromagnetic ... system." 18 U.S.C. § 2510(12). Clearly, the language of this section is broad enough to include programming transmitted by satellites. Section 2511(4),[2] specifying the punishment for a violation of section 2511(1), supports our view regarding the scope of that section. In excluding certain types of unencrypted and unscrambled satellite transmissions not intercepted for commercial advantage or private financial gain from the reach of section 2511(1), subsection (c) of 2511(4) establishes that satellite transmissions are contemplated by the Wiretap Act.[3]
 
 
 9
 Despite the broad language of the Wiretap Act, Davis alleges that the Senate report accompanying the ECPA demonstrates a Congressional intent to restrict the prosecution for theft of satellite programming to the Communications Act of 1934 (CA). In support, Davis quotes language in that report stating that "[t]he private viewing of satellite cable programming, network feeds and certain audio subcarriers will continue to be governed exclusively by section 705 [47 U.S.C. § 605] of the Communications Act of 1934, as amended, and not by ... [the Wiretap Act]." S.Rep. No. 541, 99th Cong., 2d Sess. (1986) [hereinafter Senate Report], reprinted in 1986 U.S.C.C.A.N. 3555, 3576. However, 18 U.S.C. § 2511(4)(c) excludes from the Wiretap Act's proscriptions satellite transmissions transmitted "to a broadcasting station for purposes of retransmission to the general public," but only if the transmissions are not encrypted or scrambled. 18 U.S.C. § 2511(4)(c)(i). In many instances, network feeds are transmitted by satellite. Consequently, network feeds are satellite transmissions transmitted "to a broadcasting station for purposes of retransmission to the general public" and, adhering to Davis's view, are unconditionally excepted from the Wiretap Act by the Senate language quoted above. However, as earlier stated, the language of 2511(4)(c) excepts these signals only if they are unscrambled or unencrypted. In order to harmonize the statement in the Senate report (excluding satellite cable programming and network feeds from the Wiretap Act) with the plain language of section 2511(4)(c)(i), we must assume that the statement means only to exclude unencrypted and unscrambled programming and feeds from coverage by the Wiretap Act. See 132 Cong.Rec. S14451 (1986) (statement of Sen. Mathias) (discussing the ECPA and recognizing that networks may preserve the privacy of news footage transmitted via satellite by encrypting). Subsection 2511(2)(g)(iii)(II) supports this interpretation. Subsection 2511(2)(g)(iii)(II) states that it "shall not be unlawful under this chapter ... to engage in any conduct which ... is excepted from the application of ... [47 U.S.C. § 605(a) ] by ... [47 U.S.C. § 605(b) ]." Subsection 605(b)(1) expressly exempts programming that is not encrypted. Had Congress wished to exempt all satellite programming from the reach of the Wiretap Act, it would have been unnecessary to include in the Wiretap Act the narrower exclusion provided by subsection 2511(2)(g)(iii)(II). United States v. Lande, 968 F.2d 907, 910 (9th Cir.1992); see 132 Cong.Rec. S14453 (1986) (statement of Sen. Mathias) (stating that "[a]s a general rule, conduct which is illegal under section 705 of the Communications Act [47 U.S.C. § 605] would also be illegal under this bill [ECPA]").
 
 
 10
 Furthermore, when the ECPA was introduced, several senators expressed concern "about the bill's penalty structure for the interception of certain satellite transmissions by home viewers." Senate Report, 1986 U.S.C.C.A.N. at 3560. Rather than remove interception of satellite transmissions by home viewers from the proscriptions of the Act, Congress responded to these concerns by altering the penalty provisions for this conduct, but only when the signals intercepted were unencrypted and unscrambled. See 18 U.S.C. § 2511(5). Additionally, the Senate report accompanying the ECPA specifically mentions the private viewing of satellite programming and states that the section 2511(5) exception to the criminal penalties of section 2511(4)(a) & (b) only applies "if the communication is not scrambled or encrypted." Senate Report, reprinted in 1986 U.S.C.C.A.N. 3555, 3576.
 
 
 11
 Excluding unencrypted and unscrambled network feeds and programming from the Wiretap Act's scope makes sense since these signals may be easily and inadvertently intercepted by anyone with a dish antenna and appropriate tuner without illegal modifications to any element. Receiving and decrypting or unscrambling a satellite signal, however, takes significant effort and is not an act of inadvertence. Furthermore, the act of encrypting or scrambling a satellite signal evinces the originator's intent to prevent unauthorized persons from viewing the transmission and communicates this intent unequivocally to persons receiving the encrypted or scrambled signal. An unencrypted or unscrambled signal does not inherently demonstrate or communicate this intent.
 
 
 12
 Citing United States v. Schweihs, 569 F.2d 965 (5th Cir.1978), Davis next argues that his conviction under 18 U.S.C. § 2512(1)(b)[4] is improper because the devices contemplated by that section are devices primarily useful for "surreptitious interception." In Schweihs, the defendant attached alligator clips to an amplifier[5] and attempted to attach the amplifier to a phone line carrying an alarm signal. The district court found the defendant guilty of violating section 2512(1)(b). In reversing, the Fifth Circuit held that section 2512(1)(b) does not prohibit the surreptitious use of all electronic devices, but, rather, prohibits the possession of devices primarily useful for surreptitious interception. Schweihs, 569 F.2d at 969. Because "no design characteristics" of the amplifier in Schweihs "suggest[ed] surreptitious listening as ... [a] primary function" and because the defendant's amplifier was "basically an ordinary amplifier[ ] that can be used in conjunction with radios, phonographs, and other audio equipment, and ... [was] not primarily useful for the purpose of surreptitious interception," the court held the defendant had not violated section 2512(1)(b). Id. (emphasis in original).
 
 
 13
 Davis's reliance on Schweihs is misplaced. First, Davis did not simply add alligator clips to extend the input port of his device, as the defendant had done in Schweihs. Davis altered the operation of the VCII devices by making major modifications. He opened the devices, thereby breaking a security seal, removed an epoxy-protected microprocessor chip by melting and chipping away the epoxy, added a connector and replaced the removed microprocessor chip with a new one containing modified software. Once completed, his modifications made it possible for the device to descramble and decrypt satellite programming without the knowledge of the cable companies. The modifications also made it all but impossible to use the device in any legitimate fashion. For instance, any attempt to have a cable company change the service of any system equipped with one of Davis's devices, by adding or deleting programming, would have been impossible without disclosure of the illegal modification because the new microprocessor chip changed the original address of the device. Additionally, any direct examination of a device in order to discover its address or to repair it would have led to the discovery of the illegal modifications. Consequently, individuals possessing these modified devices were required to use them in a most surreptitious manner. Also, "[a] device will not escape the prohibition merely because it may have innocent uses. The crucial test is whether the design of the device renders it primarily useful for surreptitious listening." S.Rep. No. 1097, 90th Cong.2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2183 (emphasis in original). Accordingly, the devices Davis modified violated section 2512(1)(b).
 
 
 14
 B. Can Davis be Prosecuted Under Both the Wiretap Act and the Communications Act of 1934?
 
 
 15
 The government argues that it was not barred from prosecuting defendant's conduct under both 47 U.S.C. § 605(a) & (e)(4) and 18 U.S.C. §§ 2511, 2512. We agree. When two statutes cover the same conduct there is no implicit repeal of the earlier statute. See Radzanower v. Touche Ross & Co., 426 U.S. 148, 153-55, 96 S.Ct. 1989, 1992-93, 48 L.Ed.2d 540 (1976). "Rather, the legislative intent to repeal must be manifest in the 'positive repugnancy between the provisions.' " United States v. Batchelder, 442 U.S. 114, 122, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979) (quoting United States v. Borden Co., 308 U.S. 188, 199, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939)). When two statutes prohibit the same conduct, the Government may prosecute under either statute or simultaneously prosecute under both statutes as long as it does not discriminate against any class of defendants. Batchelder, 442 U.S. at 123-24, 99 S.Ct. at 2203-04; Ball v. United States, 470 U.S. 856, 860 n. 7, 105 S.Ct. 1668, 1671 n. 7, 84 L.Ed.2d 740 (1985). Davis did not raise the issue of whether the Double Jeopardy clause permits him to be punished under both acts. See Illinois v. Vitale, 447 U.S. 410, 415, 100 S.Ct. 2260, 2264, 65 L.Ed.2d 228 (1980); see, e.g., United States v. Holt, 969 F.2d 685 (8th Cir.1992); United States v. Duke, 940 F.2d 1113 (8th Cir.1991). Accordingly we do not address that issue. See Lande, 968 F.2d at 913 n. 13.
 
 III. CONCLUSION
 
 16
 For the reasons stated above we affirm Davis's convictions.
 
 
 17
 JOHN R. GIBSON, Circuit Judge, dissenting, with whom McMILLIAN and FAGG, Circuit Judges, join, dissenting.
 
 
 18
 I respectfully dissent.
 
 
 19
 Following the lead of the Ninth and Tenth Circuits, the court today concludes that Davis's convictions under 18 U.S.C. § 2512(1)(b) should stand. United States v. Lande, 968 F.2d 907 (9th Cir.1992); United States v. McNutt, 908 F.2d 561 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). I believe that Davis's conduct is not covered under 18 U.S.C. § 2512(1)(b) and, therefore, I would reverse his convictions on those counts.
 
 
 20
 The majority distinguishes Schweihs on the ground that Davis modified the VCII devices without the knowledge of the cable companies, and that his modifications served no "legitimate" purpose. These distinctions are illusory. The modifications made in Schweihs are analogous to the modifications made to the VCII devices. Once the amplifier was placed on the telephone line, it certainly served no "legitimate" use. Likewise, the victim's knowledge or lack thereof is not the basis for the decision in Schweihs.
 
 
 21
 I am persuaded by the reasoning of the Eleventh Circuit in United States v. Herring, 933 F.2d 932 (11th Cir.1991). There, the Eleventh Circuit held that § 2512(1)(b) does not apply to the sale and manufacture of satellite pay-television descramblers. Id. at 935.
 
 
 22
 The Eleventh Circuit first considered the legislative history of section 2512 and concluded that the sale and manufacture of descramblers would not have been covered under 2512(1)(b) prior to the 1986 amendments. Relying on Schweihs, the Eleventh Circuit reasoned that Section 2512 did not apply because the design of the descramblers included "significant nonsurreptitious and legitimate uses," including authorized reception of "soft scrambled" signals which are ninety percent of satellite television signals. Therefore, the descramblers were not "primarily useful for surreptitious listening." Id. at 934. The Eleventh Circuit went on to observe that the 1986 amendments to the Wiretap Law did not broaden the meaning of surreptitious. Id. at 935. The court rejected the argument that Section 2512(1)(b) applied to the sale and manufacture of modified descramblers because Congress simultaneously excepted viewing of unencrypted satellite transmissions under Section 2511, because section 2511 is much broader than section 2512, and contains no requirement that the interception be surreptitious. Id. The court also rejected the reasoning of McNutt, (and that of the majority opinion here), concluding that the appropriate inquiry is not whether the descramblers can be used for surreptitious listening. Id. at 939. The court reiterated that Section 2512 applies only if the design of the descramblers makes them primarily useful for surreptitious listening. Id. Because the descramblers had "significant legitimate uses," the court concluded section 2512(1)(b) did not apply. Id. Finally, the Eleventh Circuit found further support for its holding because 47 U.S.C. § 605 governed the sale and manufacture of modified descramblers. Id. at 935.
 
 
 23
 I believe the Eleventh Circuit's approach is correct. Therefore, I would reverse Davis's convictions for violations of 18 U.S.C. § 2512(1)(b).
 
 
 
 [1]
 18 U.S.C. § 2511 states in relevant part:
 (1) Except as otherwise specifically provided in this chapter any person who--
 (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
 ....
 shall be punished....
 
 
 [2]
 18 U.S.C. § 2511(4) states in pertinent part:
 (a) Except as provided in paragraph (b) of this subsection or in subsection (5), whoever violates subsection (1) of this section shall be fined ... or imprisoned....
 ....
 (c) Conduct otherwise an offense under this subsection that consists of or relates to the interception of a satellite transmission that is not encrypted or scrambled and that is transmitted--
 (i) to a broadcasting station for purposes of retransmission to the general public; or
 (ii) as an audio subcarrier intended for redistribution to facilities open to the public ...
 is not an offense under this subsection unless the conduct is for the purposes of direct or indirect commercial advantage or private financial gain.
 (emphasis added).
 
 
 [3]
 The maxim of statutory construction expressio unius est exclusio alterius is followed here. This maxim dictates that an expressly stated exception to liability impliedly excludes all other exceptions. See Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 2.2(i), at 85 (2d ed. 1986)
 
 
 [4]
 18 U.S.C. 2512 states in relevant part:
 (1) Except as otherwise specifically provided in this chapter, any person who intentionally--
 ....
 (b) manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, ...
 ....
 shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [5]
 There is some question as to whether Schweihs also attached an input capacitor to the amplifier or whether the amplifier as purchased contained this capacitor. For the purposes of our discussion it is irrelevant how the input capacitor ended up in the unit since input capacitors are generally present in most amplifiers