UNITED STATES of America, Appellee,

v.

Candisha S. ROBINSON, Appellant.

No. 92–3062.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1992.

Decided June 18, 1993.

Order Granting Rehearing En Banc
and Vacating Judgment Oct. 8, 1993.

David B. Smith (appointed by this Court), for appellant.

Peter V. Taylor, Asst. U.S. Atty., of the bar of the Superior Court of the District of Columbia, pro hac vice, by special leave of court, with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher, Thomas C. Black, and William E. Lawter, III, were on brief, for appellee.

Before: MIKVA, Chief Judge, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Dissenting opinion filed by Circuit Judge HENDERSON.

MIKVA, Chief Judge:

Candisha Robinson was convicted after a jury trial of numerous drug-related offenses including "us[ing] or carr[ying] a firearm" during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Ms. Robinson concedes that the evidence was sufficient to support a finding that she constructively possessed the unloaded derringer found in the locked trunk in her apartment, but argues that her conviction under section 924(c)(1) should be reversed because the evidence failed to establish that the gun was actually used during and in relation to the drug trafficking offenses for which she was

convicted. Ms. Robinson also contends that the district court erroneously increased her sentence by two points on the grounds that she was a "supervisor" to a drug trafficking scheme, and erroneously imposed a $300 rather than a $200 special assessment fee. We agree with appellant, with respect to all three arguments, and therefore reverse her conviction under section 924(c) and remand to the district court for resentencing.

## I.

According to the government's evidence, on July 15, 1991, Officer Larry Hale approached appellant's sister, Veloria Robinson, and told her that he wished to buy some crack cocaine. Veloria took Officer Hale to Apartment 3, 1722 West Virginia Avenue, N.E. and knocked on the door. When appellant Candisha Robinson opened the door, Veloria explained that Officer Hale was trying to get something. Candisha asked him what he wanted. Officer Hale said that he wanted a "twenty" and followed Veloria into the apartment. Officer Hale saw Veloria and Candisha go into the apartment's one bedroom and observed Candisha hand Veloria a rock of crack cocaine. Veloria then gave the rock to Officer Hale in exchange for $20 in marked money.

The next evening, Officer Hale returned to the apartment. As he was walking up the steps, he was approached by a man named Kwarme Parker. Parker stated that Veloria was inside the apartment, but that he also lived in the apartment and could serve him. Parker went into the apartment while Officer Hale waited in the hallway outside the front door. When Parker returned to the hallway, he gave Officer Hale a small rock of crack cocaine in exchange for marked money.

About thirty minutes later, a search warrant was executed at the apartment. Inside a locked trunk in the bedroom closet, the police found a .22–caliber derringer and holster, a 1990 tax return signed by Candisha, a letter from Candisha's employer, two rocks of crack cocaine weighing a total of 10.88 grams, $20 in marked money from the sale of cocaine made by Mr. Parker, and $42.80 in other cash. Other papers bearing appellant's name were found in other parts of the bedroom, including a lease which identified appellant and another man as the principal lessees. A plastic cassette tape case was also found in the bedroom which contained a quantity of plastic ziplock bags.

At trial, the government called an expert witness, Detective David Stroud, who testified that the rock of cocaine in the locked trunk would have a $700–800 street value, as-is, but a $1400 value if it was broken down into $20 chunks. With respect to the firearm found in the apartment, Detective Stroud characterized the .22–caliber derringer as a "second gun"—the kind of gun a drug dealer might hide on his person for use until he could get to his "real gun." Mr. Stroud also testified that guns are generally used by drug dealers to protect themselves from rival drug dealers; the police, and employees within the organization.

When asked to describe a "crack house," Detective Stroud explained that there are two basic varieties. In the first type of crack house, he said, drugs are "manufactured on the premises, cut up and bagged up for street-level distribution." He added that "maybe in some cases they even sell drugs from the premises." However, Detective Stroud noted, this would be taking "a very big risk because you're inviting a raid … unlike selling on the street." In the other type of crack house, people come just to smoke the drug. "There may be some limited selling of the drug going on, and they even rent the pipes to you for $2 a pipe in some of them."

Ms. Robinson took the stand in her defense. She admitted that she leased the apartment and received rent money from her sister Veloria, Kwarme Parker, and Sharine McKinney. She also acknowledged that she owned the foot-locker in which the derringer and crack were found, and that she knew that Ms. McKinney used drugs, and that Mr. Parker was selling drugs (but not out of her apartment). Ms. Robinson insisted that she had no knowledge of the drugs or the derringer found in her footlocker. She explained that she had taken Mr. Parker in temporarily because he had no place to go, but had become upset with his drug-dealing and had

given him two weeks to find somewhere else to stay. She admitted allowing him to use the footlocker to safeguard his money, but claimed that she tried to prevent him from bringing drugs into her apartment by searching him and inspecting the footlocker regularly. This account was corroborated in significant respects by the testimony of Ms. Bey and Ms. McKinney. Both of them testified that appellant refused to allow Mr. Parker to sell drugs from the apartment; Ms. McKinney specifically recalled that appellant often searched Mr. Parker when he entered the apartment to ensure that he was not carrying drugs.

Ms. Robinson presented an alibi for the distribution charge. She testified that she was not in the apartment on the evening of July 15 because she was spending the night with her boyfriend in a motel. Her boyfriend, Mr. Founteroy, corroborated this story by testifying that they spent the day together going fishing and then spent the night together at a hotel. This alibi was partially contradicted by Ms. McKinney, who testified that she thought appellant was home for part of the evening, until about 10 P.M., which was almost an hour after Officer Hale said he saw appellant recover drugs from the bedroom.

Lastly, appellant read to the jury a portion of the transcript from Veloria Robinson's plea hearing. At the plea hearing, Veloria Robinson stated that it was her girlfriend, not appellant, who retrieved the crack that she sold to Officer Hale on July 15. In rebuttal, the government introduced testimony of an officer who stated that he was unable to find an original receipt for the hotel at which appellant and her boyfriend claimed they stayed on July 15.

Appellant Candisha Robinson was found guilty on all six counts of the indictment, including distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); possession with intent to distribute a quantity of cocaine base in excess of five grams, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii); commission of the charged drug offenses within 1000 feet of a school, in violation of 21 U.S.C. § 860(a); maintenance of a building for the purpose of manufactur-ing, storing, distributing or using cocaine base, in violation of 21 U.S.C. § 856(a); and use or carrying of a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1).

Ms. Robinson submitted a post-verdict motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) directed solely to the count charging her with violating section 924(c)(1). Judge Richey denied the post-verdict motion in a memorandum opinion and order filed on December 18, 1991. 779 F.Supp. 606. At the sentencing hearing, Judge Richey adopted the Probation Officer's recommendation that Ms. Robinson's offense level be increased by two, from 28 to 30, because the evidence suggested that she was a "supervisor" of the drug trafficking scheme. Ms. Robinson was sentenced to a total of 157 months imprisonment, a four year term of supervised release and a special assessment of $300.

## II.

■ Ms. Robinson challenges the sufficiency of the evidence to support her conviction under section 924(c). See 18 U.S.C. § 924(c)(1). Ms. Robinson concedes that the evidence was sufficient to support a finding that she constructively possessed the derringer found in the locked trunk in her bedroom closet, but argues that the evidence failed to establish that she actually "used" the gun "during and in relation to" the drug trafficking offenses for which she was convicted—as required by section 924(c)(1). The government, for its part, does not argue that Ms. Robinson carried, brandished or otherwise used the derringer during or in relation to the distribution of the drugs to Officer Hale. Rather, the government argues that we should affirm Ms. Robinson's conviction because Ms. Robinson's apartment was a "crack house," and in crack houses, the mere proximity of a gun to drugs is sufficient to support the inference that the defendant used the gun to protect the possession of the drugs.

When reviewing these respective claims, we are, of course, bound to view the evidence in the light most favorable to the government

and respect the right of the jury to determine the credibility of witnesses, weigh evidence, and draw justifiable inferences of fact. *United States v. Williams*, 952 F.2d 418, 419 (D.C.Cir.1991). Indeed, it is well established that this Court must defer to the jury's determination and affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In our effort to determine whether there was sufficient evidence to support the essential elements of section 924(c), we turn first to the language of the statute. Section 924(c) states, in pertinent part:

> Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years.

On its face, section 924(c) conspicuously fails to criminalize mere possession of a firearm during and in relation to a drug trafficking offense; the statute reserves punishment only for those individuals who actually carry or "use" a firearm during and in relation to an illicit drug offense. Given the way section 924(c) is drafted, even if an individual intends to use a firearm in connection with a drug trafficking offense, the conduct of that individual is not reached by the statute unless the individual actually uses the firearm for that purpose. As explained succinctly in *United States v. Bruce*, 939 F.2d 1053, 1055 (D.C.Cir.1991), "Congress did not make it a crime to possess a gun with the *intent* to use it in relation to a drug trafficking crime. Instead, section 924(c) only makes it a crime to *use* a gun in relation to a drug trafficking crime."

Initially, the distinction between intended use and actual use may appear to put quite a hurdle in the path of a prosecutor seeking a conviction under section 924(c), particularly in cases such as this, where the primary drug offense underlying the conviction is possession with the intent to distribute. (There is absolutely no evidence that the gun played any role in the distribution of drugs to Officer Hale.) As this Court remarked in *Bruce*,

it can be "somewhat difficult analytically to determine how one goes about using a gun in relation to that crime." *Id.* It is important to keep in mind, however, that even in cases where the underlying drug offense is possession with the intent to distribute, the government is not limited to evidence indicating that the defendant fired, brandished, or carried the firearm. *Cf. United States v. Evans*, 888 F.2d 891, 896 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990). We have also identified numerous other factors which may be probative of actual use, including the accessibility of the firearm, the type of firearm, the number of firearms, the proximity of the firearm to the drugs, and whether the firearm was loaded or previously had been used. *See United States v. Morris*, 977 F.2d 617 (D.C.Cir.1992). Although these factors are not automatically determinative of actual use, they can help the government to prove, as it must, a "nexus ... between a particular drug offender and the firearm," *United States v. Long*, 905 F.2d 1572, 1577 (D.C.Cir.1990), *cert. denied*, 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990), and that "the guns facilitate[d] the predicate offense in some way." *United States v. Jefferson*, 974 F.2d 201, 205 (D.C.Cir.1992) (quoting *United States v. Harris*, 959 F.2d 246, 261 (D.C.Cir.1992)).

In this case, most of the factors we have identified in previous section 924(c) cases cut against the affirmance of appellant's conviction. First, there is absolutely no evidence that Ms. Robinson has ever brandished or previously used the firearm found in the locked trunk. *Cf. Evans*, 888 F.2d at 896 (evidence that the gun was used to threaten a subordinate suggests actual use for purposes of section 924(c)); *Jefferson*, 974 F.2d at 207. Second, although it is unclear whether Ms. Robinson had the key to the lock on the trunk, the gun certainly was not easily accessible since it was in the bedroom closet in a locked footlocker. Thus, this case stands in sharp contrast to cases like *Morris* where the firearm was within "easy reach," *see Morris*, 977 F.2d at 623, as well as *Jefferson*, where the appellant placed the gun in the back yard so that people who needed the gun in relation to drug activity could have easy access. *Jefferson*, 974 F.2d at 207 (admission

that the gun was previously used to protect possession of drugs supported section 924(c) conviction).

Still, the government contends that the gun was used by Ms. Robinson to protect her stash of drugs in the locked trunk. We fail to see, however, how the gun—being in a locked trunk in a bedroom closet—would be of any help to Ms. Robinson in the event of an emergency. In order to brandish the gun, Ms. Robinson would have to run to the closet, unlock the trunk, open the trunk and grab the gun. *See United States v. Derr*, 990 F.2d 1330, 1337–38 (D.C.Cir.1993) (essential element of "use" under section 924(c) not established where the closet would have to be unlocked with keys before the gun would be accessible). Even at that point, the gun would be of virtually no use to Ms. Robinson since it was unloaded and there was no ammunition for it anywhere in the apartment. *Cf. United States v. Anderson*, 881 F.2d 1128, 1141 (D.C.Cir.1989) ("presence of loaded guns and ammunition" is pertinent evidence of actual use of firearms); *Morris*, 977 F.2d at 622 ("the fact that a gun is loaded strengthens the inference that it is actual use"). The fact that the gun was unloaded, locked away, and without ammunition anywhere on the premises, strongly suggests that Ms. Robinson had no *intention* of using the gun at that time.

Finally, we have specifically drawn distinctions between a small derringer, like the one at issue in this case, *see Bruce*, 939 F.2d at 1055, and a sawed-off shotgun, which we have recognized as a "formidable firearm" for the protection of a stash of drugs. *Jefferson*, 974 F.2d at 208. Even the government's drug expert, Officer Stroud, confessed to the jury that the derringer recovered from the locked footlocker was not the type of gun a drug dealer ordinarily would use to protect a stash of drugs. It is also worthy of note that only one gun was found on the premises. While the use of a single gun can violate the statute, *see Jefferson*, 974 F.2d at 207, when evaluating the sufficiency of the evidence under section 924(c), we have expressly distinguished the possession of a single gun from the possession of an "arsenal" of weapons.

*See Anderson*, 881 F.2d at 1141; *Morris*, 977 F.2d at 622.

In short, the possession of this single, unloaded .22–caliber derringer found in a locked trunk in a bedroom closet falls significantly short of the type of evidence we have held to establish actual use under the statute. In fact, we have reversed convictions under section 924(c) where there was stronger evidence against the defendant than that which is present here. In *United States v. Bruce*, 939 F.2d 1053 (D.C.Cir.1991), for example, we carefully explored the distinction between intended use and actual use under section 924(c), and concluded that although the police found a stash of drugs next to a fully loaded .22–caliber derringer in the pocket of the appellant's trench coat, the evidence was insufficient to support the conviction under the statute. We noted that the appellant lived in the apartment with his mother and other family members, and that his gun was stored in a belt buckle found inside a brown paper bag. We held that the only reasonable view of the evidence was that the appellant would use the gun only when distributing drugs elsewhere, away from his family's apartment, sometime in the future.

We also reversed the appellant's conviction in *United States v. Derr*, 990 F.2d 1330 (D.C.Cir.1993), a case which is remarkably similar to this one—save the fact that a more powerful gun and ammunition were recovered by the police in that case. In *Derr*, an unloaded, holstered, .357 Magnum revolver was found by police in a locked closet in close proximity to nine rounds of .357 ammunition. The gun and ammunition were on top of a locked box containing 18.4 grams of crack cocaine and drug paraphernalia. Although the evidence in *Derr* firmly supported the conclusion that the appellant planned to use the gun in the future when distributing the drugs contained in the locked box, the inaccessibility of the gun in the locked closet, and the fact that the gun was unloaded, fatally undermined the government's theory that the defendant actually used the firearm to protect his current possession of drugs.

Despite the precedent militating in favor of reversal here, and the obvious shortcomings in the record evidence, the government ar-

gues that a rational juror still could have inferred actual use of the firearm in this case because Ms. Robinson's apartment was a "crack house." In the government's view, this case is analogous to *United States v. Williams*, 952 F.2d 418 (D.C.Cir.1991), and *United States v. Anderson*, 881 F.2d 1128 (D.C.Cir.1989), where convictions were upheld under section 924(c) because the proximity of the firearms to the drug paraphernalia in the "crack houses" strongly indicated that the guns were there to protect the occupants' possession of the drugs.

We do not dispute that "crack houses" present unique considerations for the purposes of section 924(c). In crack houses, unlike ordinary residences, it is reasonable to assume that readily accessible guns found on the premises are being used to protect the drugs stored there. As we noted in *Bruce*, "[i]f guns are strewn around a 'crack house' in which drugs are stored," one may infer "that the guns are there to protect the occupant's possession" of drugs. *Bruce*, 939 F.2d at 1055. *See also Jefferson*, 974 F.2d at 208 (in the context of crack houses, "protection of a drug operation may be presumed from the amount of firepower discovered on the premises").

Yet not every apartment or home that contains crack cocaine is a "crack house." As the government's expert explained, crack houses are much more than simply places where crack cocaine may be found. Crack houses are typically places where large quantities of crack cocaine are manufactured or where people come for the purpose of smoking the drug. Although the government asserts that Ms. Robinson's apartment fits within the expert's first definition of a crack house—a house maintained for the purpose of manufacturing large quantities of crack cocaine—none of the typical indicia of such a crack house was found on the premises. No scales, razor blades, equipment, or ingredients were found anywhere in the apartment. The small quantity of baggies found in the apartment is consistent with the evidence that some persons residing in the apartment were selling small amounts of crack cocaine, not with the operation of a "crack house" of the type described by the government's ex-

pert witness. We also note that although the appellant was convicted of maintaining a building for the purpose of manufacturing, storing, distributing, or using cocaine base, in violation of 21 U.S.C. § 856(a), that statute is extremely broad and certainly not limited to "crack houses."

More importantly, even if Ms. Robinson's apartment was a "crack house," the mere presence of one or more factors generally indicative of actual use of a firearm does not automatically establish "use" under the statute. *See Bruce*, 939 F.2d at 1055 (although the defendant constructively possessed a loaded gun which was accessible and in close proximity to drugs, the conviction under section 924(c)(1) was reversed because the evidence merely suggested intended, not actual, use). The dissent mistakenly suggests that the mere proximity of a gun to drugs is sufficient to support a conviction under section 924(c) where the underlying offense is a violation of 21 U.S.C. § 856(a). *See* Dissent at 896. In fact, according to the dissent's logic, possession of any kind of gun anywhere in a crack house makes out a section 924(c) violation. That cannot be so. Where the evidence indicates that the gun recovered from a crack house was not actually used in relation to drug activity, a conviction under section 924(c) may not stand. Even in *Anderson* and *Williams* (which the dissent cites approvingly), the guns were not only in close proximity to drugs, but were also powerful, loaded and easily accessible.

Unlike *Williams*, this case does not involve a "slew of weapons [and] ammunition" in close proximity to a large quantity of drugs. *Williams*, 952 F.2d at 419. Nor does this case involve guns that are strewn around a crack house in easy reach or in plain sight, as in *Anderson*. *Anderson*, 881 F.2d at 1140. This case involves a single, unloaded, .22–caliber derringer stored in a locked trunk with a stash of drugs. Apparently, the gun was never brandished or even removed. And while the government is free to buttress its evidence of "use" by expert testimony identifying the indicia of a drug trafficking operation, *see Morris*, 977 F.2d at 622, in this case, the government's expert witness hurt, rather than helped, the prosecutor's case.

Not only did the expert's definition of a "crack house" wholly fail to describe Ms. Robinson's apartment, the expert also explicitly stated that a derringer is not the type of weapon a drug dealer would generally rely upon to protect a stash of drugs. Under these circumstances, we are compelled to conclude that this case is controlled by our decisions in *Bruce* and *Derr* rather than *Anderson* and *Williams*. The only reasonable view of the evidence in this case is that the gun was intended for use at some future date.

We note that the dissent argues that *Bruce* and *Derr* are distinguishable from this case because Ms. Robinson was convicted of a distribution offense whereas the defendants in *Bruce* and *Derr* were not. *Bruce*, 939 F.2d at 1056; *Derr*, 990 F.2d at 1333. While, in general, it may be easier to establish actual use in cases where the underlying offense is distribution (as opposed to possession with intent to distribute), in this case, there is absolutely no evidence, aside from the mere proximity of the derringer to the stash of drugs, that the gun played any role whatsoever in Ms. Robinson's distribution of drugs to Officer Hale.

If there were evidence that a loaded gun was in reach of Ms. Robinson at the time of distribution, this would be a different case. But there is no such direct evidence. The gun was unloaded and found the day after Ms. Robinson sold the crack. Plainly, the jury can not legitimately infer that even the unloaded gun was in Ms. Robinson's reach the day before. That is just speculation.

Moreover, mere proximity of a gun to drugs is not, and has never been, sufficient to support a conviction under section 924(c) in this circuit. As we explained in *Morris,* the proximity of a gun to drugs "may cut either way, depending upon the particular facts." *Morris,* 977 F.2d at 622. Nevertheless, the dissent contends that where distribution is an underlying offense, little regard need be given to whether the gun was loaded or unloaded, locked in a safe or in plain view; nor must we consider any of the other factors this Court has identified as relevant in section 924(c) cases. *See Morris,* 977 F.2d at 621–23 (and cases cited therein). The theory

the dissent advances would require us to uphold a conviction under section 924(c) whenever the defendant is convicted of a distribution offense and the defendant's gun is found in close proximity to drugs. In the dissent's view, this practice would be justified, regardless of the surrounding circumstances, since it is possible to speculate that the defendant was "emboldened" by the possession of the gun to commit the distribution offense. *See* Dissent at 895–96 (quoting *United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985)). Although this may, indeed, be the dissent's preferred result, the dissent is unable to cite a single case in this circuit which holds, or even hints, that mere proximity of a gun to drugs, and nothing more, is sufficient to support a conviction under section 924(c). The result urged by the dissent is particularly remarkable given that all the other factors identified as relevant by this Court cut the other way. Perhaps this is the reason the government never pushed this novel argument on appeal.

### III.

■ Ms. Robinson also challenges the district court's sentencing determination. The district court explicitly adopted the Probation Officer's recommendation that Ms. Robinson's offense level should be increased by two points, from 28 to 30, because she played the role of a "supervisor" to a drug trafficking scheme. *See* U.S.S.G. § 3B1.1(b). The Probation Officer based this conclusion on two factors: 1) Ms. Robinson had "allowed her apartment to be used for storing drugs and money," and 2) Ms. Robinson had "advised her sister, Veloria Robinson, to get drugs for the undercover officer."

The government now admits that the second factor relied upon by the Probation Officer is factually inaccurate. The government's evidence clearly showed that it was Veloria Robinson who asked appellant to get the $20 rock for Officer Hale, not the other way around. Had the district court offered an additional explanation for its determination that appellant was a "supervisor," other than its explicit adoption of the Probation Officer's conclusion, reversal of the sentencing determination would not be so clear.

However, the district court stated only that it adopted the Probation Officer's report "as part of the court's findings," and cryptically added that "the defendant was at least in the apartment in question before the instant offense." Since the court clearly relied on a misstatement of fact when adopting the Probation Officer's conclusions, we remand for a reconsideration of whether Ms. Robinson was, in fact, subject to an increase in her offense level for being a "supervisor."

Finally, Ms. Robinson objects to the district court's failure to reduce her special assessment from $300 to $200 after it vacated Count Three and Count Seven of the original indictment. Since the government concedes that Ms. Robinson should have been subjected to only four special assessments of $50 each, pursuant to 18 U.S.C. § 3013(a)(2)(A), we direct the district court on remand to reduce the special assessment accordingly.

*Reversed and remanded.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the remand to reconsider whether Candisha Robinson (Robinson) acted as a "supervisor" within the meaning of U.S.S.G. § 3B1.1(c) and to reduce the special assessment from $300 to $200 pursuant to 18 U.S.C. § 3013(a)(2)(A). I dissent because in my view this case is distinguishable from *United States v. Bruce*, 939 F.2d 1053 (D.C.Cir.1991), and *United States v. Derr*, 990 F.2d 1330 (D.C.Cir.1993), the cases upon which the majority primarily relies. Moreover, in concluding that Robinson did not "use" a firearm "in relation to" a drug trafficking crime, 18 U.S.C. § 924(c)(1), the majority opinion perpetuates this court's misuse of two factors—the number and the firepower of the firearm(s) used. Neither of these factors is mentioned in the statutory language nor does either affect the "use" of a firearm.

As the majority notes, Officer Hale made two purchases from Robinson's apartment. On July 15, 1991, Veloria Robinson, Robinson's sister, took Hale to the apartment. After her sister knocked on the front door, Robinson answered and asked what Hale wanted. He asked for a "twenty" and stood in the entrance of the apartment as the two sisters went into the apartment's only bedroom. Hale observed Robinson hand her sister, Veloria, a rock of crack cocaine. Veloria Robinson came out of the bedroom and gave Hale the crack; he paid her with marked money. The next evening Hale returned to make another purchase. This time Kwarme Parker, Robinson's tenant, approached him outside the apartment. Parker indicated that Veloria Robinson was inside the apartment and that he could serve him. Parker went inside while Hale waited outside. Parker returned and exchanged a rock of crack for marked money. Hale did not see Robinson during this sale.

Thirty minutes later, the police executed a search warrant for the apartment. Robinson was then present. Inside a locked trunk in the bedroom closet, the police found 10.88 grams of crack cocaine with an estimated street value of $1,440, the marked money from the Parker drug sale, another $42.80, various personal papers containing Robinson's name and a holstered .22 caliber derringer. In the bedroom, the police also found a plastic case for a cassette tape that contained numerous ziplock bags.

At trial, Robinson took the stand in her defense. She claimed that on July 15 she was out of town during the day and stayed overnight in a local motel. She admitted that she owned the trunk and used it to store many of her belongings. She testified that she looked inside the trunk each day [1] and that the last time she examined it before her arrest was the night of July 14. According to her testimony, she frisked Parker, who also lived in the apartment, each time he entered the apartment because she suspected that he was selling drugs. Finally, Robinson maintained that she had never seen the gun or any drugs in her apartment.

Robinson was convicted on all six counts of the indictment: one count of possession with intent to distribute more than five grams of

---

1. Robinson's testimony thus is at odds with the majority's assertion that "it is unclear whether Ms. Robinson had the key to the lock on the trunk." Majority Opinion at 888.

cocaine base in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(C), one count of possession with intent to distribute more than five grams of cocaine base within 1,000 feet of a school in violation of 18 U.S.C. § 860(a), one count of distribution of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), one count of distribution of cocaine base within 1,000 feet of a school in violation of 21 U.S.C. § 860(a), one count of maintenance of a premises to manufacture, distribute, store or use a controlled substance in violation of 21 U.S.C. § 856(a)(1) and one count of using or carrying a firearm "during and in relation to any ... drug trafficking crime" in violation of 18 U.S.C. § 924(c)(1). The district court denied her motion for judgment of acquittal. *United States v. Robinson,* 779 F.Supp. 606 (D.D.C.1991). She appeals only the section 924(c)(1) conviction. The majority reverses her firearm conviction because "the possession of this single, unloaded .22–caliber derringer found in a locked trunk in a bedroom closet falls significantly short of the type of evidence we have held to establish actual use under the statute." Majority Opinion at 888. The majority concludes that "[t]he only reasonable view of the evidence in this case is that the gun was intended for use at some future date." *Id.* at 890.

To reach its conclusion, the majority relies on *Bruce* and *Derr.* In *Bruce,* the police seized a trench coat in the front closet of the apartment where the defendant lived. In the pockets of the coat, the police found ziplock bags of crack cocaine, cocaine powder and marijuana; a brown bag containing empty ziplock bags; and "a brown bag containing a belt buckle which held a fully loaded .22 caliber four-shot derringer, as well as eight rounds of .22 ammunition." *Bruce,* 939 F.2d at 1054. The defendant was convicted of possession of more than five grams of cocaine base with intent to distribute and use of a firearm in violation of section 924(c)(1).

We reversed the firearm conviction because "the evidence established only that the gun was *intended* to be used for defendant's protection at the time and place of subsequent distribution." *Id.* at 1056 (emphasis

original). We reached this conclusion because

> the gun—a small derringer hidden in a belt buckle stored in a paper bag alongside drugs in the pocket of a raincoat hanging in a closet—would clearly appear to be intended for use only at the time of distribution. It is hardly the sort of weapon a drug dealer would employ for protection against an effort to penetrate a crack house.

*Id.* at 1055. We were able to distinguish between *present* use and *intended* use because "there was no evidence presented that any distribution of drugs took place at the apartment." *Id.* at 1056. In other words, because the defendant was convicted of possession with intent to distribute and not distribution, we concluded that, while the gun might be used to protect Bruce during *future* distribution, it was not being *used* at the time of discovery to protect the drugs. "We do not see how it can be said that under such circumstances the gun is used in relation to the *possession* of the drugs, regardless of the defendant's intention to distribute the drugs subsequently." *Id.* (emphasis original).

In *Derr,* while executing a search warrant for the apartment of the defendant's friend, the police came upon a locked closet. After opening the door to the closet, the police found an unloaded, holstered .357 Magnum revolver and nine rounds of ammunition on top of a pile of miscellaneous items. Directly under the gun, the police located a plastic bag containing a padlocked wooden box. Inside the box, they found 18.4 grams of crack cocaine as well as drug paraphernalia. In other parts of the apartment, they found more drug paraphernalia. Derr, who sometimes stayed in the apartment, was charged with possession with intent to distribute and using a gun "during and in relation to his *possession* of the drugs." *Derr,* 990 F.2d at 1333 (emphasis added). The jury convicted Derr on both counts. We emphasized that a conviction under section 924(c)(1) requires "evidence showing that the firearm actually facilitated the *possession* of the drugs." *Id.* at 1337 (emphasis original). We added: "*When the predicate offense is possession,* it is also insufficient for the evidence to indicate

that the gun would be used at a later time in distributing the drugs." *Id.* at 1337 (emphasis added); *see Bruce,* 939 F.2d at 1056.

The majority's reliance on *Bruce* and *Derr* stems from its totally inexplicable statement that "the *primary* drug offense underlying the conviction is possession with the intent to distribute." Majority Opinion at 887 (emphasis added). Nothing could be further from the truth. Robinson was convicted not only of *possession* with intent to distribute; she was also convicted of *distribution* and *maintenance of a premises for the purpose of distributing drugs,* neither of which convictions she contests. Contrary to the majority's view, *Bruce, Derr* and every other case it cites is inapposite because not one of those cases involved distribution or maintenance convictions.[2] Robinson's uncontested convictions on the distribution and maintenance counts put her in a category wholly separate from Bruce, Derr and the other defendants whose mere possession convictions have led this court to distinguish between present and future intentions, an "exceedingly slippery slope" according to one of my colleagues. *United States v. Morris,* 977 F.2d 617, 623 (D.C.Cir.1992) (Silberman, J., concurring). Whether or not she "used" the gun in relation to her possession of crack with intent to distribute may be, if anything, *irrelevant.* The real question is whether she used the firearm "during and in relation to" her distribution and maintenance offenses.

Among the several inaccuracies contained in the majority opinion is the statement that "[t]he government, for its part, does not argue that Ms. Robinson carried, brandished or otherwise used the derringer during or in relation to the distribution of the drugs to Officer Hale." Majority Opinion at 886–87. If the majority means by this statement that

Officer Hale did not in fact see Robinson display the firearm, then I do not disagree. If, however, the majority means, as I think it does, that the government admits that there is no evidence to suggest that Robinson used, within the meaning of section 924(c)(1), the firearm when she distributed the crack to Officer Hale, I do not agree.

When a defendant challenges the sufficiency of the evidence to support his conviction, we must defer to the jury's determination and affirm if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *United States v. Long,* 905 F.2d 1572, 1576 (D.C.Cir.), *cert. denied,* 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). We must "view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the jury to determine the weight and the credibility of the evidence." *United States v. Sutton,* 801 F.2d 1346, 1358 (D.C.Cir.1986); *United States v. Butler,* 924 F.2d 1124, 1126 (D.C.Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991). Supporting evidence can be either direct or circumstantial. *United States v. Kegler,* 724 F.2d 190, 196 (D.C.Cir.1983); *United States v. Carter,* 522 F.2d 666, 681–82 (D.C.Cir.1975). The evidence supporting Robinson's section 924(c)(1) conviction is circumstantial which means that inferences are to be drawn from the relevant circumstances. The most significant circumstance is that the firearm was found together with the crack in Robinson's trunk in her bedroom *the night after she had distributed crack from that location.* Robinson denied she had been in the apartment the night before and the jury disbelieved her. If the jury rejected her

---

**2.** *United States v. Derr,* 990 F.2d 1330 (D.C.Cir. 1993) (possession with intent to distribute); *United States v. Morris,* 977 F.2d 617 (D.C.Cir.1992) (same); *United States v. Jefferson,* 974 F.2d 201 (D.C.Cir.1992) (same); *United States v. Williams,* 952 F.2d 418 (D.C.Cir.1991) (same), *cert. denied,* — U.S. —, 113 S.Ct. 148, 121 L.Ed.2d 99 (1992); *United States v. Bruce,* 939 F.2d 1053 (D.C.Cir.1991) (possession with intent to distribute and possession); *United States v. Long,* 905 F.2d 1572 (D.C.Cir.) (possession with intent to distribute), *cert. denied,* 498 U.S. 948, 111 S.Ct.

365, 112 L.Ed.2d 328 (1990); *United States v. Evans,* 888 F.2d 891 (D.C.Cir.1989) (same), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990); *United States v. Anderson,* 881 F.2d 1128 (D.C.Cir.1989) (same). The majority parenthetically cites *United States v. Harris,* 959 F.2d 246 (D.C.Cir.) (per curiam) (distribution and conspiracy to distribute), *cert. denied,* — U.S. —, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992), which upheld the section 924(c)(1) convictions.

testimony regarding her whereabouts on July 15, that rejection can, and does, inform its interpretations and conclusions with respect to the rest of her testimony. A defendant disbelieved as to one count does not suddenly become a model of credibility with respect to the remaining counts. The jury could have reasonably inferred that Robinson had obtained the crack from her trunk when Officer Hale saw her hand her sister the crack in her bedroom; indeed, according to the evidence, the only crack found in the apartment was in the trunk. The jury could have just as reasonably concluded that the .22 caliber derringer, found with the crack and seized from the locked trunk the next night, was in the same location a short time earlier.[3]

Once the jury concluded that Robinson opened the trunk on July 15, there are only two possible conclusions: either the gun was in the trunk then or it was placed in the trunk between the evening of the 15th and the time of the search on the evening of the 16th. The jury disbelieved her testimony that she never saw drugs in the apartment; it was also free to disbelieve her testimony that she never saw the gun. Moreover, the government is "not required to disprove every conceivable scenario in which appellant would be innocent"; instead, a defendant "is entitled to a judgment of acquittal 'only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Whetzel,* 589 F.2d 707, 711–12 (D.C.Cir.1978) (quoting *United States v. Davis,* 562 F.2d 681, 683 (D.C.Cir.1977)). Once the jury concluded that the gun was in the trunk with the crack at the time Robinson distributed the crack, it then had to determine whether the gun was "use[d] or carrie[d]"[4] during and in relation to the distribution.

3. Robinson testified that she had not looked inside the locker since the evening of July *14.* But that assertion flowed from her testimony that she did not go home the night of July 15, testimony the jury did not believe. ′

4. Although the government does not argue on appeal that Robinson "carried" the gun during and in relation to a drug trafficking crime, the evidence indicates that during the July 15th distribution she carried the gun as well. We have held that "carry" as used in section 924(c)(1)

We have held that "[m]ere possession of a gun even by a drug trafficker does not violate the statute." *United States v. Morris,* 977 F.2d 617, 621 (D.C.Cir.1992). Nonetheless, "we have construed the term as broad enough to encompass *any* case in which the gun facilitated or had a role in the trafficking offense." *Id.* (emphasis added). A defendant need not brandish or fire the gun in order to use it. *Id.; see United States v. Jefferson,* 974 F.2d 201, 205 (D.C.Cir.1992); *United States v. Evans,* 888 F.2d 891, 896 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990); *United States v. Anderson,* 881 F.2d 1128, 1141 (D.C.Cir.1989).

We have further held that the only limitation on the language in section 924(c)(1) "is that the guns be used 'in relation' to the drug trafficking crime involved, which we think requires no more than that the guns *facilitate the predicate offense in some way.*" *United States v. Harris,* 959 F.2d 246, 261 (D.C.Cir.) (per curiam) (emphasis added), *cert. denied,* —— U.S. ——, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992). The relationship between the firearm and the predicate offense is satisfied

> "[i]f the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor *who had the opportunity or ability* to display or discharge the weapon to protect himself or intimidate others, *whether or not such display or discharge in fact occurred.*"

*Id.* (emphasis added) (quoting *United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985) (Kennedy, J.), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987)); *see also Morris,* 977 F.2d `at 623 (same); *United States v. Morrow,* 977 F.2d 222, 231 (6th Cir.1992) (en banc) (same); *United States v.*

"need not be read in a 'hypertechnical or narrow' way." *United States v. Evans,* 888 F.2d 891, 894 (D.C.Cir.1989) (citation omitted), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990). A weapon need not be on a defendant's person to convict him of "carrying" a firearm. *Id.* at 895. "[A] jury could properly infer that ... [the defendant] 'carried' the gun in the sense that it was within reach and available to protect him during his ongoing [drug trafficking offense]." *Id.*

*Vasquez,* 909 F.2d 235, 239 (7th Cir.1990) (same), *cert. denied,* —— U.S. ——, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991).[5]

Robinson's circumstances easily satisfy the possession or control prong of the test. The jury could have reasonably concluded that she had possession or control of the gun. The police found the gun in her trunk, which she checked every day. The locker was in the closet in her bedroom in her apartment. *See Anderson,* 881 F.2d at 1141.

The gun also facilitated the distribution. The majority observes that because the gun was inside the locked trunk, it "certainly was not easily accessible" or "within 'easy reach,'" Majority Opinion at 888 (quoting *Morris,* 977 F.2d at 623), and therefore could not be used to protect Robinson or her drug stash. From its location in the trunk *next to the drugs,* however, the derringer served two purposes. First, it protected *Robinson* during distribution. While reaching to get the drugs, Robinson could easily grab the small gun without being noticed, providing her with personal protection or allowing her to intimidate others. Using the derringer in this way corresponds with its original use. *See infra* at n. 12. In *United States v. Wilson,* 938 F.2d 785 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 946, 117 L.Ed.2d 115 (1992), the Seventh Circuit concluded "that a defendant intended to use the firearm in facilitation of a drug related crime 'if it [is] strategically located so as to be quickly and easily available for use during a *drug transaction.'"* *Id.* at 791 (quoting *United States v. Whitley,* 905 F.2d 163, 166 (7th Cir.1990) (quotation omitted)) (emphasis in *Wilson*). In *Wilson,* the police, after stopping the de-

fendant, found the gun in the locked trunk of his car. Nevertheless, the Seventh Circuit upheld his conviction under section 924(c)(1) because the gun "was strategically located directly on top of the bag containing the cocaine and the defendant knew where the gun was and it was loaded and readily accessible for use if necessary should any problems arise during the drug transaction." *Id.; see also Jefferson,* 974 F.2d at 207 (finding gun was accessible in case of emergency where gun was located in grass-catcher bag next to drugs).[6]

Second, the derringer protected *the drugs* during distribution. Again, the gun's location made it easily accessible during distribution, thus providing protection *at that time.* If Robinson had "'the opportunity or ability to display or discharge,'" *Harris,* 959 F.2d at 261 (quoting *Stewart,* 779 F.2d at 540), the gun at the time of distribution, which the jury could have reasonably concluded based on its proximity to the drugs, the jury could have likewise reasonably concluded that the gun "'facilitated ... the crime'" by protecting her or the drugs, thereby "'emboldening'" her to commit the crime. *Id.* (quoting *Stewart,* 779 F.2d at 540).[7]

Moreover, even if her distribution conviction did not support Robinson's section 924(c)(1) conviction, her conviction based on 21 U.S.C. § 856(a)(1) does. The jury found, and Robinson does not contest, that she violated 21 U.S.C. § 856(a)(1) by maintaining a premises to manufacture, distribute, store or use a controlled substance. Although the

---

**5.** A charge under section 924(c)(1) can be made without separately charging the underlying drug offense. *See United States v. Hill,* 971 F.2d 1461, 1463–64 (10th Cir.1992) (en banc); *United States v. Munoz–Fabela,* 896 F.2d 908, 910–11 (5th Cir.), *cert. denied,* 498 U.S. 824, 111 S.Ct. 76, 112 L.Ed.2d 49 (1990); *United States v. Hunter,* 887 F.2d 1001, 1003 (9th Cir.1989), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990). In fact, a conviction under section 924(c)(1) can stand notwithstanding acquittal on the predicate drug offense. *United States v. Laing,* 889 F.2d 281, 288–89 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990); *cf. United States v. Gibbs,* 904 F.2d 52, 55 (D.C.Cir.1990).

**6.** That the gun here may have been unloaded (there was no affirmative evidence one way or the other) and that no ammunition was present are matters of little importance. Many courts

have found that an unloaded gun can violate section 924(c). *See, e.g., United States v. Gutierrez–Silva,* 983 F.2d 123, 125 (8th Cir.1993) (quickly accessible firearm in close proximity to drugs violated section 924(c) even though gun was unloaded and no ammunition was found); *United States v. Hill,* 967 F.2d 902, 905–07 (3d Cir.1992) (easily accessible rifle located next to drugs violated section 924(c) even though gun was unloaded, no ammunition was present and rifle stock was separated from barrel).

**7.** In *United States v. Feliz–Cordero,* 859 F.2d 250, 254 (2d Cir.1988), a case cited with approval in *Bruce,* 939 F.2d at 1055, and in *Long,* 905 F.2d at 1578, the Second Circuit stated that "use" in relation to distribution is satisfied by:

i) Proof of a transaction in which the circumstances surrounding the presence of a firearm suggest that the possessor of the firearm in-

majority goes to great lengths in its attempt to show that Robinson's apartment was not really a "crack house," its discussion is irrelevant. Whether or not Robinson's apartment fits the usual description of a crack house, the jury found that she maintained her apartment in violation of section 856(a)(1) and she does not challenge that finding.

Maintenance of a premises for the purpose of distributing drugs is not a "passive," *Bruce*, 939 F.2d at 1055, crime like possession. We noted in *United States v. Lancaster*, 968 F.2d 1250, 1253 (D.C.Cir.1992), that

> [s]ection 856(a)(1) makes it unlawful only to "open or maintain any place *for the purpose of* manufacturing, distributing, or using any controlled substance." The "casual" drug user does not run afoul of this prohibition because he does not maintain his house for the purpose of using drugs but rather for the purpose of residence, the consumption of drugs therein being merely incidental to that purpose.

(emphasis added in *Lancaster*). Because it is an ongoing offense,[8] the jury could permissibly conclude that a gun found on the premises was being used "during and in relation to" that offense. And the majority's chief authority, *Bruce*, expressly recognizes this difference:

> If guns are strewn around a "crack house" in which drugs are stored, it might be inferred that the guns are there to protect the occupant's "possession." In such a case, the guns are "used" in relation to the

drug trafficking crime of possession with intent to distribute because they are intended to protect the stash of drugs that will subsequently be distributed. And although the actual distribution is a separate crime, courts have treated evidence of use of guns in such a house for protection of the distribution function as equivalent to protection of possession. Since in the typical crack house possession and distribution are intertwined, that seems to us to be a logical interpretation of the statute.

*Bruce*, 939 F.2d at 1055 (citations omitted).[9] In other words, Robinson used the gun to facilitate ongoing drug trafficking crimes (actual distribution on the premises and maintenance of a premises for the purpose of distributing drugs) and therefore violated section 924(c)(1).[10]

The majority attaches significance to the presence of only one gun to conclude that Robinson did not use the derringer to protect herself or the drugs. We have considered the number of guns present to be a factor in determining usage, see *Morris*, 977 F.2d at 622, and have distinguished between an "arsenal" of guns to protect distribution sites and a single gun. *See United States v. Williams*, 952 F.2d 418, 421 (D.C.Cir.1991). *Compare United States v. Anderson*, 881 F.2d 1128 (D.C.Cir.1989) *with United States v. Bruce*, 939 F.2d 1053 (D.C.Cir.1991). At the same time, however, we have made clear that the use of only one gun violates section 924(c)(1). *See Morris*, 977 F.2d at 622. Sec-

---

tended to have it available for possible use during the transaction; or ii) The circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available for use during such a transaction.

Robinson's circumstances satisfy both tests delineated in *Feliz–Cordero*, that is, her distribution conviction fits the first circumstance and her section 856(a)(1) conviction fits the second.

**8.** Indeed, we *know* that at least two instances of crack distribution occurred in Robinson's apartment within a twenty-four hour period.

**9.** The only difference between the premises described in *Bruce* and Robinson's apartment is the absence in the latter of "guns strewn around." *Bruce*, 939 F.2d at 1055. The danger, if not error, in distinguishing between one gun and more than one gun in an analysis of section 924(c)(1) is discussed *infra*.

**10.** The Supreme Court's most recent decision interpreting section 924(c)(1) supports affirming Robinson's conviction. In *Smith v. United*

States, —— U.S. ——, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), the Court, citing, *inter alia*, *United States v. Harris, supra*, declared:

> The phrase "in relation to" is expansive, as the courts of appeals construing § 924(c)(1) have recognized. Nonetheless, the phrase does illuminate § 924(c)(1)'s boundaries. According to Webster's, "in relation to" means "with reference to" or "as regards." The phrase "in relation to" thus, at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence. As one court has observed, the "in relation to" language "allays explicitly the concern that a person could be" punished under § 924(c)(1) for committing a drug trafficking offense "while in possession of a firearm" even though the firearm's presence is coincidental or entirely "unrelated" to the crime. Instead, the gun at least must *"facilitate, or have the potential of facilitating,"* the drug trafficking offense.

*Id.*, —— U.S. at —— ——, 113 S.Ct. at 2058–59 (citations omitted) (emphasis added).

tion 924(c)(1) requires the use of "a" firearm, not multiple firearms. *See United States v. Freisinger,* 937 F.2d 383, 390 (8th Cir.1991) ("A statute which prefaces the object of the offense with the word 'a' unambiguously authorizes singular units of prosecution.").

On the rare occasion that we have found the use of one gun violative of the statute, the firearm was large and powerful. *See Jefferson,* 974 F.2d at 208 ("a 12–gauge shotgun is a formidable firearm"). But section 924(c)(1) does not require that a gun be of a certain caliber or size to come within the statute.[11] Nor does the use of the firearm have to be successful. A drug defendant's choice of a less effective firearm does not affect his use of it. The reason any firearm no matter its size or firepower violates section 924(c)(1) when used during and in relation to a drug trafficking crime is obvious: Any gun can kill or wound. *See Blank Pistol Kills Actor, The Son of Bruce Lee,* N.Y. Times, April 1, 1993, at A14.

By creating a hierarchy of guns, we encourage a defendant to argue about the characteristics of his firearm in order to establish that it does not come within section 924(c)(1)'s proscription. Indeed, Robinson's counsel asserted at oral argument:

> COUNSEL: [The derringer] is basically a joke of a weapon....

THE COURT: Well, now wait a minute. It's not a joke of a weapon, it can kill people—

COUNSEL: Well, it can, if you get lucky—

Disparagement of the derringer ignores reality.[12] Some of my colleagues have referred to the gun as "lowly," *Jefferson,* 974 F.2d at 209, and "ornamental," *Morris,* 977 F.2d at 622. Perhaps they have forgotten it was a derringer that took the life of Abraham Lincoln. *See* George C. Nonte, Jr., Pistol & Revolver Guide 16 (1975).

I have no difficulty concluding that Robinson used the derringer in violation of section 924(c)(1). Accordingly, I dissent.

Before: MIKVA, Chief Judge; WALD, HARRY T. EDWARDS, SILBERMAN, BUCKLEY, STEPHEN F. WILLIAMS, D.H. GINSBURG, SENTELLE, KAREN LeCRAFT HENDERSON, and RANDOLPH, Circuit Judges.

## ORDER

### Oct. 8, 1993.

Appellee's Suggestion For Rehearing *En Banc* and the response thereto have been circulated to the full Court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service voted in favor of the suggestion. Upon consideration of the foregoing it is

11. Section 924(c)(1) does differentiate among firearms in providing for punishment. For example, use of a short-barreled rifle or shotgun increases the punishment from five years' to ten years' imprisonment. If the firearm is "a machine gun, or destructive device, or is equipped with a firearm silencer or firearm muffler," the punishment is thirty years. If the conviction is the defendant's second or subsequent conviction under section 924(c)(1), the punishment increases to twenty years for a firearm other than a machine gun or a firearm that is a destructive device or equipped with a silencer or muffler. For the latter category, a second conviction results in life imprisonment without release.

12. The history of the derringer began in the mid 1800s, the age of the riverboat gambler. As one author noted, "[t]he Derringer in the late 19th century was known as the 'gambler's gun,' because it could be hidden up a man's sleeve and flipped into his hand in an instant." Robert Hertzberg, The Modern Handgun 68 (1965). It

became popular because it was easy to conceal and was effective in emergency situations. One author described it as

> truly the gun for the ladies' hand bag. It is very small, as was the original Remington from which it was redesigned. It is also an excellent under cover gun for the peace officer or soldier for emergency use, or for anyone for a close range defense gun. The small cartridge is not the best for serious work but is far better than no gun at all and is quite effective at close range where such a gun would be used.

Elmer Keith, Sixguns by Keith 83–84 (1955). The modern derringer is likewise an effective weapon. The government's expert witness testified that "[t]he first weapon of choice among dealers is a .357 or .44 magnum, or something more powerful than this, but it's still as effective as that .357 or .44 magnum."

ORDERED, by the Court *en banc*, that the suggestion is granted and this case will be reheard by the Court sitting *en banc*.

It is FURTHER ORDERED, by the Court *en banc*, that the judgment of the court filed herein on June 18, 1993, is hereby vacated.